# STATE OF CONNECTICUT *v.* RENALDO TERRELL RESPASS
## (SC 16252)

McDonald, C. J., and Borden, Palmer, Sullivan and Vertefeuille, Js.[1]

[1] The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued September 29, 2000—officially released May 15, 2001

*Jeremiah Donovan*, special public defender, with whom, on the brief, was *Rita Christopher*, for the appellant (defendant).

*Michael L. Regan*, senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, and *Paul E. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. After a jury trial, the defendant, Renaldo Terrell Respass, was convicted of possession of a narcotic substance with the intent to sell by a person who is not drug-dependent in violation of Gen-

eral Statutes § 21a-278 (b),[2] possession of narcotics with intent to sell within 1500 feet of a private elementary school in violation of General Statutes § 21a-278a (b),[3] possession of marijuana with intent to sell in violation of General Statutes § 21a-277 (b),[4] and failure to appear

---

[2] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, halluci-nogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execu-tion of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[3] General Statutes § 21a-278a provides in relevant part: "(b) Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, sell-ing, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. . . ."

[4] General Statutes § 21a-277 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than

in violation of General Statutes (Rev. to 1997) § 53a-172.[5] The trial court rendered judgment in accordance with the verdict and the defendant appealed to the Appellate Court. Thereafter, we transferred the appeal to this court pursuant to General Statutes § 51-199[6] and Practice Book § 65-1.[7]

On appeal, the defendant claims that the trial court improperly: (1) determined that the search warrant application set forth sufficient probable cause; (2) instructed the jury with respect to the elements of constructive possession; (3) declined to impose any sanction upon the prosecution for failure to disclose before trial a postarrest statement of the defendant; and (4) denied the defendant's posttrial motion to summon and question a juror who had told other jurors that he knew the defendant's supplier of illicit drugs. We reject all of the defendant's claims and, therefore, affirm the judgment of the trial court.

---

twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

[5] General Statutes (Rev. to 1997) § 53a-172 provides: "(a) A person is guilty of failure to appear in the first degree when, while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear.

"(b) Failure to appear in the first degree is a class D felony."

[6] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . . . The court to which a cause is transferred has jurisdiction."

[7] Practice Book § 65-1 provides: "When, pursuant to General Statutes § 51-199 (c), the supreme court (1) transfers to itself a cause in the appellate court, or (2) transfers a cause or a class of causes from itself to the appellate court, the appellate clerk shall notify all parties and the clerk of the trial court that the appeal has been transferred. A case so transferred shall be entered upon the docket of the court to which it has been transferred. There shall be no fee on such transfer. The appellate clerk may require the parties to take such steps as may be necessary to make the appeal conform to the rules of the court to which it has been transferred, for example, supply the court with additional copies of the record and the briefs."

The jury reasonably could have found the following facts. On May 29, 1997, five officers from the New London police department and the statewide narcotics task force conducted a search pursuant to a warrant at 48 Crystal Avenue, apartment A-97, in New London. After they knocked on the door and received no response, the officers opened the door using a master key. There was no one in the apartment.

The officers thereafter searched a clothes closet in the master bedroom. In the pockets of a man's jacket in the closet, one of the officers found one package of ninety glassine envelopes, each containing a white powder that was later identified as heroin. The officers also found in the same pocket another package of 100 glassine envelopes that contained white powder, which was determined to be heroin, and, in another pocket in the jacket, four plastic bags containing a plant-like material, later identified as marijuana.

While the officers were conducting the search they heard a noise at the apartment door. One of the officers went to investigate and found the defendant attempting to enter the apartment. When the defendant saw the police officers, he ran toward the stairwell. Two officers chased the defendant down nine flights of stairs and out onto Crystal Avenue, where they obtained assistance from a patrol car. The officers in the patrol car pursued the defendant, caught up to him and placed him under arrest.

During the booking process, the officers advised the defendant of the charges against him, and told him that his wife also had been arrested and charged with respect to the drugs found in the apartment. The defendant stated that his wife was not involved with the drugs and admitted that he had obtained the drugs from Calvin Sebastian. When asked to prove that his wife was not involved with the drugs by revealing where the

drugs were hidden, the defendant replied that the drugs were in a jacket in the closet. Additional facts will be set forth as needed.

I

The defendant first claims that the trial court improperly determined that probable cause existed to justify a search warrant for his apartment. The defendant argues that the information in the search warrant application did not establish probable cause under the fourth amendment to the United States constitution[8] or article first, § 7, of the Connecticut constitution.[9]

On May 29, 1997, the affiants submitted to a judge of the Superior Court an application for a search warrant, including a supporting affidavit, requesting authorization to search the defendant's apartment for heroin, cocaine, other controlled substances, drug paraphernalia and additional items used in the trafficking of narcotics.[10] The judge, *Parker, J.*, issued the warrant that same day.

---

[8] The fourth amendment to the United States constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[9] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[10] Specifically, the warrant application listed the following property: "Heroin, cocaine, other controlled substances, cutting agents, white powders, plastic bags, scales, measuring devices, monies and written records pertaining to sales of narcotics, telephone records, bank and financial records, and/or safe deposit keys, weapons, handguns, and electronic devices such as portable telephones, pagers, numbers stored within the pagers at the time of seizure, equipment capable of identifying incoming telephone calls and scanners used for the communication and protection of drug operatives, computers used for record keeping practices and cameras commonly used for the protection of drug trafficking operations."

The affidavit supporting the application for the search warrant consisted of twenty-nine pages and fifty-one paragraphs. The affiants stated that they were members of the statewide narcotics task force and that they had training and experience in narcotics investigations. On the basis of information obtained from four reliable informants, surveillance, and numerous controlled narcotics buys, the affiants claimed that Sebastian was operating a large scale cocaine and heroin distribution network throughout the city of New London.

The defendant[11] is the subject of paragraph forty-four of the affidavit, which alleged: "That specific to this investigation the affiants have knowledge that Sebastian utilizes 48 Crystal Ave. A-97, New London, CT. to store and distribute narcotics throughout the Crystal Ave. housing complex. That based on CI [confidential informant] information and surveillance the affiants can confirm that Sebastian supplies [the defendant] who resides at 48 Crystal Ave. A-97, New London, CT. That throughout this investigation surveillance has determined Sebastian frequents 48 Crystal Ave. New London, and has been seen conducting numerous drug related transactions. That on 04/25/97 an undercover officer purchased a quantity of narcotics from [the defendant]. That the undercover officer positively identified [the defendant] at a later date during a surveillance of 48 Crystal Ave. New London, CT. when the undercover officer observed [the defendant] exit his vehicle and enter 48 Crystal Ave., New London, CT. That CI-C [a confidential informant] has stated to affiant [Officer Sean] Dautrich that [the defendant] is Sebastian's main associate who sells Sebastian's narcotics within Crystal Ave. housing complex. That CI-C further stated he has [firsthand] observed quantities of narcotics within the residence of [the defendant] and has been present when

[11] The defendant is referred to as both "Respath" and "Repath" in the affidavit.

Sebastian has delivered the narcotics to [the defendant]." The only other reference to 48 Crystal Avenue, apartment A-97, in the warrant affidavit was in paragraph thirty-six, which provided in relevant part: "That based on the affiants training and experience locations such as . . . 48 Crystal Ave. A-97 New London, CT. are properties utilized to facilitate an ongoing large scale narcotic trafficking operation. . . ."

The defendant moved to suppress all evidence obtained during the search on the grounds that the warrant lacked probable cause, was overbroad, and contained a deliberate falsehood. The trial court denied that motion. Later, the defendant filed a second motion to suppress pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), alleging that the warrant application contained either a deliberate falsehood or a statement made in reckless disregard for the truth. Specifically, the defendant alleged that the following statements in the affidavit were false: "That on 04/25/97 an undercover officer purchased a quantity of narcotics from [the defendant]. That the undercover officer positively identified [the defendant] at a later date during a surveillance of 48 Crystal Ave. New London, CT. when the undercover officer observed [the defendant] exit his vehicle and enter 48 Crystal Ave., New London, CT." At the hearing on his motion, the defendant produced evidence that an informant had bought narcotics at the direction of an undercover officer, but that the officer did not purchase the drugs himself as stated in the affidavit accompanying the warrant application. The defendant produced an affidavit from the informant who allegedly had purchased drugs from the defendant at the direction of the undercover officer. The informant stated in the affidavit that the defendant was not the individual who had sold those drugs to her.

The trial court thereafter found that the defendant had made a substantial showing in accordance with *Franks,* and deleted from paragraph forty-four of the affidavit accompanying the warrant application the following lines: "That on 04/25/97 an undercover officer purchased a quantity of narcotics from [the defendant]. That the undercover officer positively identified [the defendant] at a later date during a surveillance of 48 Crystal Ave. New London, CT. when the undercover officer observed [the defendant] exit his vehicle and enter 48 Crystal Ave., New London, CT." The court then considered whether the remaining allegations in the affidavit supported a finding of probable cause and concluded that, even without the deleted information, the remainder was sufficient to establish probable cause. Drawing reasonable inferences from the facts presented, the court held that the warrant established probable cause. Accordingly, the court denied the defendant's motion to suppress.

"The standards for upholding a search warrant are well established. We uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . [T]he magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Where the circumstances for finding probable cause are detailed, where a substantial basis for crediting the source of information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories." (Citation

omitted; internal quotation marks omitted.) *State* v. *Rosario*, 238 Conn. 380, 385, 680 A.2d 237 (1996).

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . We view the information in the affidavit in the light most favorable to upholding the magistrate's determination of probable cause. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination." (Citations omitted; internal quotation marks omitted.) *State* v. *Vincent*, 229 Conn. 164, 171–72, 640 A.2d 94 (1994). "Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Diaz*, 226 Conn. 514, 541, 628 A.2d 567 (1993).

The defendant argues that the trial court misapplied the "totality of the circumstances" test as enunciated by the United States Supreme Court in *Illinois* v. *Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 1453 (1983), to assess the reliability of the information provided in the affidavit by the confidential informant CI-C.

In *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991), this court adopted the totality of the circum-

stances test, overruling *State* v. *Kimbro*, 197 Conn. 219, 496 A.2d 498 (1985), in which this court had adopted the *Aguilar-Spinelli* test.[12] In *Barton*, this court concluded that "our adoption of a 'totality of the circumstances' analysis of the probable cause requirement of article first, § 7, of our constitution means simply this: When a search warrant affidavit is based on information provided to the police by confidential informants, the magistrate should examine the affidavit to determine whether it adequately describes both the *factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable.* If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the magistrate can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this determination, the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and

---

[12] *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The *Aguilar-Spinelli* test "provides a method for evaluating the existence of probable cause . . . when a search warrant affidavit is based upon information supplied to the police by a confidential informant." *State* v. *Barton*, supra, 219 Conn. 534–35. Under the *Aguilar-Spinelli* test, "[t]he issuing judge must be informed of (1) some of the underlying circumstances relied on by the informant in concluding that the facts are as he claims they are, and (2) some of the underlying circumstances from which the officer seeking the warrant concluded (a) that the informant, whose identity need not be disclosed, was credible, or (b) that the information was reliable. . . . When the information supplied by the informant fails to satisfy the *Aguilar-Spinelli* test, probable cause may still be found if the warrant application affidavit sets forth other circumstances—typically independent police corroboration of certain details provided by the informant—that bolster the deficiencies." (Citations omitted.) Id., 535.

has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate." (Emphasis added.) *State* v. *Barton*, supra, 544–45.

"In rejecting the complex rules that had evolved from *Aguilar* and *Spinelli*, however, neither the United States Supreme Court's decision in *Gates*, nor our decision in *Barton* rejected the underlying concerns that originally had been expressed by the *Aguilar-Spinelli* inquiry. Rather, the *Gates* and *Barton* decisions both reaffirmed that the veracity or reliability and the basis of knowledge inquiries formulated in *Aguilar[-Spinelli]* remain highly relevant in the determination of probable cause . . . . In fact, both *Gates* and *Barton* stated that an informant's veracity or reliability and basis of knowledge should be regarded as closely intertwined issues that may usefully illuminate the common-sense, practical question of the existence of probable cause . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Velasco*, 248 Conn. 183, 192, 728 A.2d 493 (1999).

We begin with the veracity of the confidential informant CI-C. CI-C was registered as a confidential reliable informant by the statewide narcotics task force in April, 1997. The affiants also stated that CI-C had "been used in the past, and [had] provided information which [had] led to seizures of narcotics and arrests of those involved."[13] We have held that an informant's record of providing information that has led to arrests and sei-

---

[13] The affidavit provided in part: "That during the month of April 1997, members of the [statewide narcotics task force eastern division] registered a confidential and reliable informant, hereinafter referred to as CI-C, who provided this agency with detailed information concerning the daily activities of Calvin Sebastian and his associates pertaining to his (Sebastian) trafficking operation of both heroin and cocaine. CI-C stated that Calvin Sebastian would obtain large quantities of cocaine and heroin and package illicit drugs for mid to street level sales. That CI-C has been used in the past, and has provided information which has led to seizures of narcotics and arrests of those involved. . . ."

zures of contraband is sufficient to establish the reliability of the informant. "If an informant has a track record of providing reliable information, the issuing judge may credit the information given in the present case." *State v. Rodriguez*, 223 Conn. 127, 136, 613 A.2d 211 (1992); see also *State v. Morrill*, 205 Conn. 560, 567, 534 A.2d 1165 (1987) (same); accord *United States v. Caggiano*, 899 F.2d 99, 102 n.2, 103 (1st Cir. 1990) (informant whose information led to " 'arrests of several people for drug related offenses' " deemed reliable); *United States v. Price*, 888 F.2d 1206, 1207, 1209 (7th Cir. 1989) (informant who "had twice before provided accurate information leading to two . . . arrests" deemed reliable); *United States v. Sumpter*, 669 F.2d 1215, 1219–20 (8th Cir. 1982) (allegation that informant's prior information led to arrests). Accordingly, we conclude that the trial court reasonably could have concluded that CI-C was reliable.

Additionally, CI-C provided information from which the trial court reasonably could have inferred that the informant was a close associate of Sebastian who was in a position to observe the details of Sebastian's drug trafficking,[14] which further supported the informant's

---

[14] The affidavit provides that CI-C "provided this agency with detailed information concerning the daily activities of Calvin Sebastian and his associates pertaining to his (Sebastian) trafficking operation of both heroin and cocaine. CI-C stated that Calvin Sebastian would obtain large quantities of cocaine and heroin and package illicit drugs for mid to street level sales. . . . CI-C further stated that Sebastian would replenish his supply every seven to ten days. Furthermore, Sebastian would supply numerous locations within the city of New London on a daily basis. CI-C stated that Sebastian is a main supplier of cocaine and heroin within the city of New London and surrounding towns. CI-C stated that Sebastian has numerous associates working for him and he has a direct line to purchase large quantities of narcotics in the city of New York. CI-C stated that Sebastian is an Eastern Pequot Indian and has strong family ties to members of the Mashantucket Indian Nation. CI-C states that Sebastian often utilizes Mashantucket Tribal members' vehicles and often hides on the reservation to elude police. Sebastian often keeps narcotics and monies obtain[ed] through the illicit sale of narcotics at various residences on the reservation knowing that access for law enforcement is difficult. CI-C also knows that Sebastian keeps different

credibility. See *Illinois* v. *Gates*, supra, 462 U.S. 234 ("[an] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [a] tip to greater weight than might otherwise be the case"). Some of the information provided by the informant about Sebastian's dealings was also corroborated by independent sources. "[S]tatements made by an informant are entitled to greater weight if corroborated by evidence independently gathered by the police." *State* v. *Rodriguez*, supra, 223 Conn. 136. In the present case, CI-C provided information about Sebastian's activities that was corroborated through other sources. The informant listed a number of locations, or "safe houses," that were used by Sebastian to store narcotics, three of which were also reported by another informant. CI-C also reported that Sebastian had moved to a different residence and had provided the informant with a new telephone number. This information was corroborated by the affiants' confirmation that the number that Sebastian gave to the informant was listed in the name of the tenant of one of the safe houses. Because CI-C had provided information about Sebastian's activities that proved to be accurate, the trial court reasonably could have inferred that the informant's information about the defendant also was reliable. See, e.g., *State* v. *Weinberg*, 215 Conn. 231, 240, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990) (corroboration allows inference that "a statement which has been shown true in some respects is reasonably likely to be true in the remaining respects" [internal quotation marks omitted]).

locations in the city of New London and separates the type of narcotic [in] different residences. . . . CI-C states that said residences are 'safe houses' for storing narcotics and monies. CI-C stated that Sebastian utilizes his beeper and cell phones to arrange narcotics transaction[s] at different locations to avoid detection by the police. . . ."

We next evaluate the informant's basis of knowledge. "Generally . . . the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information . . . [as] when a person asserts that he recently saw certain items which are evidence of crime at a certain place." 2 W. LaFave, Search and Seizure (3d Ed. 1996) § 3.3 (d), pp. 141–42; id., 142–43 (listing cases). In the present case, the warrant affidavit provided: "That CI-C has stated to affiant Dautrich that [the defendant] is Sebastian's main associate who sells Sebastian's narcotics within Crystal Ave. housing complex. *That CI-C further stated that he has [firsthand] observed quantities of narcotics within the residence of [the defendant] and has been present when Sebastian has delivered the narcotics to [the defendant].*" (Emphasis added.) We conclude that the informant's report of firsthand observation of narcotics established a sufficient basis of knowledge. Accord *State* v. *Velasco*, supra, 248 Conn. 193 (quoting with approval trial court's finding that " 'the informant's reported personal observation of narcotics sales by the defendant constituted a sufficient basis for the informant's knowledge that the defendant had engaged in illegal narcotic[s] transactions' "); *State* v. *Morrill*, supra, 205 Conn. 566 ("The affidavit states that the informant personally observed the defendant sell marihuana and he heard the defendant state that he had ten pounds to sell. From these statements the magistrate could reasonably have inferred that the defendant was engaged in the ongoing criminal activity of selling marihuana.").

The defendant argues that the redacted affidavit contains nothing other than the uncorroborated assertions of the informant, which do not provide a substantial basis to establish probable cause to search the defendant's apartment. In *State* v. *Velasco*, supra, 248 Conn. 194–95, however, we held that information supplied

by a *reliable* informant, by itself, may be sufficient to establish probable cause, and that the information need not be corroborated through independent investigation. See *United States* v. *Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) ("[i]t is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant").

The defendant also argues that the information provided by the informant in the affidavit was insufficient because it lacked a definite time frame or was based on stale allegations. We conclude, however, that the issuing judge reasonably could have inferred that the events related by the informant occurred within the time frame of the investigation. The affidavit provides in relevant part: *"That specific to this investigation* the affiants have knowledge that Sebastian utilizes 48 Crystal Ave. A-97, New London, CT. to store and distribute narcotics throughout the Crystal Ave. housing complex. That based on CI information and surveillance the affiants can confirm that Sebastian supplies [the defendant] who resides at 48 Crystal Ave. A-97, New London, CT. . . . That CI-C has stated to affiant Dautrich that [the defendant] is Sebastian's main associate who sells Sebastian's narcotics within Crystal Ave. housing complex. That CI-C further stated he has first hand observed quantities of narcotics within the residence of [the defendant] and has been present when Sebastian has delivered the narcotics to [the defendant]." (Emphasis added.) The investigation into the drug trafficking operation began in October, 1996, and the affidavit related that CI-C had been registered as a confidential informant by members of the statewide narcotics task force in April, 1997. The affidavit states "[t]hat throughout this investigation surveillance has determined Sebastian frequents 48 Crystal Ave. New London, and has been seen conducting numerous drug related transactions." The issuing judge reasonably

could have concluded that the time frame of the informant's information occurred from the date when the informant was registered, April, 1997, until the date the warrant was issued, May 29, 1997, and during the period of Sebastian's repeated visits to the defendant's apartment complex.

We also are not persuaded by the defendant's argument that the information provided by the informant was stale. "It is undisputed that [t]he determination of probable cause to conduct a search depends in part on the finding of facts so closely related to the time of the issuance of the warrant as to justify a belief in the continued existence of probable cause at that time. . . . Although it is reasonable to infer that probable cause dwindles as time passes, no single rule can be applied to determine when information has become too old to be reliable. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime . . . of the criminal . . . of the thing to be seized . . . of the place to be searched . . . etc." (Citation omitted; internal quotation marks omitted.) *State* v. *Vincent,* supra, 229 Conn. 174.

We noted in *State* v. *Johnson,* 219 Conn. 557, 567, 594 A.2d 933 (1991), that "the business of dealing in illegal drugs often involves a course of conduct which continues over a long period of time . . . and is usually considered to be a regenerating activity." (Citation omitted; internal quotation marks omitted.) The warrant application in the present case presented evidence that Sebastian operated a continuing, ongoing, sophisticated, large-scale drug trafficking ring, of which the defendant and his residence were a part. Furthermore, a warrant is less likely to be stale when a defendant's home is a "secure operational base" rather than merely a "criminal forum of convenience . . . ." (Internal quotation marks omitted.) Id., 568. In the present case, the

defendant's home was one of several "safe houses" used by Sebastian to store and distribute illegal drugs. The issuing judge reasonably could have inferred that Sebastian's drug operation was ongoing up to and including the day that the warrant was executed, and that there was a reasonable probability that narcotics would be found in the defendant's apartment on May 29, 1997.

We conclude that the issuing judge, considering all of the circumstances set forth in the affidavit, reasonably could have inferred from the information provided in the affidavit that probable cause existed to search the defendant's apartment. The information supplied by the informant—that the informant had seen narcotics in the defendant's apartment and was present when Sebastian delivered narcotics to the defendant in the defendant's apartment—provided a substantial factual basis from which the issuing judge reasonably could have inferred that narcotics and other evidence of trafficking in narcotics would be found at the defendant's apartment. "We view [the] information [in a warrant] . . . in the light most favorable to the issuing judge's determination of probable cause, and [i]n a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's determination." (Internal quotation marks omitted.) *State* v. *McClendon*, 248 Conn. 572, 580, 730 A.2d 1107 (1999). In the present case, we conclude that the warrant application contained sufficient information from which the judge reasonably could infer that there was a fair probability that contraband or evidence of a crime would be found in the defendant's apartment. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

II

The defendant next argues that the trial court improperly instructed the jury regarding the specific intent

required for conviction of possession of a narcotic substance with the intent to sell in violation of § 21a-278 (b), possession of narcotics with intent to sell within 1500 feet of a private elementary school in violation of § 21a-278a (b), and possession of marijuana with intent to sell in violation of § 21a-277 (b). The defendant argues that because the instructions were improper, they deprived him of his constitutional right to due process.[15] We disagree.

The standard of review for constitutional claims of improper jury instructions is well settled. "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Delvalle*, 250 Conn. 466, 470, 736 A.2d 125 (1999). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 485, 668 A.2d 682 (1995).

The defendant was charged with three possessory offenses. He argues that the trial court failed to instruct the jury that in order for him to have "constructively possessed" narcotics, he must have had not only the

---

[15] Although the defendant did not submit a written request to charge, he excepted to the challenged instructions, thus preserving his right to appellate review. Practice Book § 16-20.

*ability* to exercise dominion and control, but also the *intent* to exercise dominion and control over the illegal drugs.[16] Cf. *State* v. *Hernandez*, 254 Conn. 659, 669, 759 A.2d 79 (2000) ("[t]o prove either actual or constructive

[16] The trial court instructed the jury regarding the intent to possess narcotics as follows: "The first essential element is that the defendant knowingly had possession of the narcotic substance, i.e. heroin. A person acts knowingly with respect to conduct when he is aware that his conduct is of such nature. Possession may be actual or constructive.

"Possession, actual or constructive, may be proven by either direct or circumstantial evidence, as those terms have been defined. Keep in mind that possession of the narcotic substance, not ownership, is what is required.

"Here, it is alleged that [the defendant] had constructive possession of the alleged narcotic substance heroin.

"This element of possession means that the defendant knew of the narcotic character of the substance, that he knew of its presence and that he exercised dominion and control over it. It is not necessary, however, that the defendant actually have the substance on his person, although that is one form of possession.

"It means having dominion and control over the substance even though it was not on the defendant's person. As long as the alleged narcotic substance heroin was in a place where it was subject to the defendant's dominion and control, where the defendant could, if he wished, go and get it, you may find it was in his possession, and that possession would be illegal if the defendant knew of the narcotic character of the substance and knew of its presence.

"Possession as used in the criminal law ordinarily signifies an *intentional control* of a designated thing accompanied by a knowledge of its character." (Emphasis added.)

Later, the court instructed the jury on intent. "The third essential element . . . is that the defendant possessed the alleged narcotic substance with the intent to sell it. Intent relates to the condition of mind of the person who commits the act, his purpose for doing it.

"As defined by our statute, a person acts intentionally with respect to conduct when his conscious objective is to engage in such conduct.

"What a person's purpose or intention has been usually is a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain purpose or intention. The only way in which a jury can ordinarily determine what a person's purpose or intention was at any given time, aside from that person's own statements, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from that, infer what his purpose or intention was.

"This inference is not a necessary one; that is, that you are not required to infer intent from the accused's conduct, but it is an inference that you

possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it" [internal quotation marks omitted]); *State* v. *Elijah*, 42 Conn. App. 687, 693, 682 A.2d 506, cert. denied, 239 Conn. 936, 684 A.2d 709 (1996) ("the defendant was required not only to know of the presence of narcotics, but also that he intended to and did exercise dominion and control over the drugs"). We conclude that the trial court's instructions, when read as a whole, adequately apprised the jury of the intent element of constructive possession. The court instructed the jury that "[p]ossession as used in the criminal law ordinarily signifies an intentional control of a designated thing accompanied by a knowledge of its character," and the court also gave a comprehensive instruction on intent.

## III

The defendant next argues that the trial court improperly declined to impose sanctions upon the prosecution for failure to disclose before trial the defendant's postarrest statement that he knew where the drugs were located. In order to prevail on this claim, the defendant must show that the trial court abused its discretion by refusing to impose sanctions upon the state. *State* v. *Troupe*, 237 Conn. 284, 311–12, 677 A.2d 917 (1996). We conclude that the trial court did not abuse its discretion by refusing to impose sanctions for nondisclosure.

After the trial had commenced, the defendant moved to suppress his postarrest statements on the grounds that the statements were involuntary and were obtained without a knowing and voluntary waiver of his right

---

may draw if you find that it is reasonable and logical and in accordance with my instructions on circumstantial evidence.

"I remind you that the burden of proving intent beyond a reasonable doubt is on the state."

against self-incrimination. During the hearing on the motion to suppress held on November 5, 1998, one of the officers testified that he had asked the defendant: "If the drugs were yours where did we find them?" The officer testified that the defendant replied "[t]hat they were in a jacket in a closet." This statement, however, was not included in the police arrest report given to the state's attorney and in turn provided to the defendant in response to his motion for discovery. The defendant's attorney learned of this statement only during the hearing on the motion to suppress. After the hearing, the trial court denied the motion to suppress, and the defendant, relying on Practice Book § 40-5 (4),[17] then orally moved to suppress only the undisclosed statement. The assistant state's attorney conceded that he had not disclosed the statement before the hearing because he had first learned of the statement either the day before, or the day of, the hearing. The defendant argued that as a result of the nondisclosure he was prejudiced in his preparation for trial, at the hearing on the motion to suppress, and in his plea negotiations. The trial court denied the defendant's motion to suppress the undisclosed statement.

---

[17] Practice Book § 40-5 provides: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following:

"(1) Requiring the noncomplying party to comply;

"(2) Granting the moving party additional time or a continuance;

"(3) Relieving the moving party from making a disclosure required by these rules;

"(4) Prohibiting the noncomplying party from introducing specified evidence;

"(5) Declaring a mistrial;

"(6) Dismissing the charges;

"(7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or

"(8) Entering such other order as it deems proper."

Practice Book § 40-5 gives broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery. *State* v. *Troupe*, supra, 237 Conn. 311–12. Generally, "[t]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Citation omitted; internal quotation marks omitted.) Id., 312. "Suppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly." *State* v. *Festo*, 181 Conn. 254, 265, 435 A.2d 38 (1980).

We conclude that the trial court did not abuse its discretion by refusing to suppress the defendant's statement. We agree with the defendant that the state's attorney's office should have taken reasonable steps to learn of the statement and to disclose it to the defendant in a timely manner. The state's attorney's office did not do so. Nevertheless, the trial court reasonably could have concluded that, because the statement was disclosed to the defense before the jury heard testimony regarding the statement, the defendant was not so significantly prejudiced that suppression of the statement was warranted. The court noted that none of the arresting officers had yet testified before the jury, and that when they did testify, the defendant could attack the credibility of the officers during cross-examination by raising their failure to include the defendant's statement in the arrest report. Additionally, the trial court

noted that, because its decision denying the suppression of the defendant's postarrest statement was not a close question, additional defense arguments regarding the undisclosed statement would not have affected the outcome, and therefore the defense was not prejudiced in preparing for the suppression hearing.

The defendant also claims that the trial court should have required the state to renew its pretrial plea bargain offer. During the hearing on the defendant's oral motion to suppress his postarrest statement, the defendant argued that in plea negotiations he was prejudiced by the nondisclosure because he had rejected a plea offer before disclosure of the statement. The defendant argued that his decision to accept or reject the plea offer "would have been affected by" knowing that one of the arresting officers would testify about the statement. The trial court suggested that the parties discuss the matter with the judge who had presided over the plea negotiations. On November 6, 1998, the parties met with the judge who had presided over the plea negotiations, and the state made a plea offer that was less lenient than had been the original offer. The defendant rejected the new offer. After that meeting, the defendant informed the trial court about the meeting, indicating that he had told the presiding judge: "I thought that I had a right to get back the original offer . . . in this case and to enter a plea to it, because if I had known about [the statement], that's the decision we would have made."[18] After the verdict was returned, the defen-

---

[15] The defense stated: "There's one other thing I would like to put on the record. And once again, nothing that I say to you, Your Honor, gives Your Honor any idea of the kinds of plea offers that have been made . . . but there is something that I have to say for the record. During the lunch break we made use of Your Honor's invitation to go back and talk with Judge Handy. And I indicated that in light of the developments, in light of the alleged statement made by [the defendant] of which I have been unaware before trial I thought that I had a right to get back the original offer . . . in this case and to enter a plea to it, because if I had known about that, that's the decision we would have made. The plea is a plea that would

dant filed a motion for a new trial, arguing, among other things, that the state's failure to comply with pretrial discovery prejudiced the defendant in plea negotiations. During the hearing on that motion on December 8, 1998, defense counsel stated that during the November 6 meeting with the presiding judge, he had indicated that "now that [the statement] ha[s] been disclosed to me we will now accept the offer to plead to what was originally offered . . . ." The state objected to counsel's characterization of what had occurred before the presiding judge: "It was my recollection of that conference that at no time did counsel indicate the defendant's willingness to accept the offer. It was an inquiry to determine if the offer was still available . . . ." Thereafter, counsel conceded that "I think [the state's attorney] is accurately reporting things. I can't say that if we had the offer back we were ready to accept it . . . ." Because the defendant had the opportunity to renegotiate the plea offer, and did not state that he would accept the original plea offer if the state renewed that offer, we conclude that the defendant was not prejudiced in plea negotiations by the late disclosure of the defendant's statement.[19]

We further conclude that, because the noncompliance in this case was inadvertent; cf. *State* v. *Festo*, supra, 181 Conn. 266 ("[t]he defendants do not claim that the prosecutor's failure to disclose was the result of bad faith"); and there was no prejudice to the defendant, the trial court did not abuse its discretion by denying the defendant's motion to suppress the statement, or by refusing to require the state to renew its original plea offer.

---

require the prosecution to do something. . . . *I asked for it and I have not been given it back.*"

[19] The defendant offers no authority for the proposition that renewal of a prior rejected plea bargain offer is an appropriate remedy for a tardy disclosure. We assume, without deciding, that it may be.

## IV

The defendant next argues that the trial court improperly denied his motion for a new trial and to have the court summon and question a juror, M.S., or for permission to interview that juror. We disagree.

During the course of jury deliberations, all of the jurors were interviewed individually to determine if they had seen the defendant being led from the courthouse in restraints. After her questioning, a certain juror, J.P., presented a note stating that she wanted to speak privately with the court. The court first conducted a bench conference with counsel, and then allowed J.P. to address the court. She stated that she thought that the court should be aware of "something I learned that you should have known before the trial . . . ." The court then excused J.P. and, after conducting a second bench conference with counsel, asked her to write down her concerns. After she did so, the court met with counsel in chambers, and, when back in session, the court marked J.P.'s note as a court exhibit. The note stated that M.S. had said that he knew Sebastian. J.P. testified as follows: "One of the other jurors said, 'how do we know there is even, in fact, a Calvin Sebastian?' And, then [M.S.] got up and he said, 'I know there is a Calvin Sebastian. I know him.' . . . And then someone else said, 'Well, why [M.S.] didn't you say that before?' [M.S. said] 'I didn't hear his name.' " The court then asked J.P. if the statement would affect her ability to act as an impartial juror: "Knowing that you have to decide this case by the evidence and the law; do you have any sense that based upon that discourse that took place that you cannot decide this case fairly and impartially based on the evidence and the law as you find the evidence and as I told the jury the law to be followed?" J.P. responded: "I take it very seriously; yes I can." The court continued: "All right, so you feel that you could?" J.P. answered: "Yes, I was thinking about

it last night, you know, and I woke up. I just wanted to be fair." After J.P. was excused, the court asked counsel: "[D]o either of you want to be heard on that issue at all?" Defense counsel answered, "No, sir."

During the subsequent examination of M.S. and the remaining jurors, the trial court asked whether they had seen the defendant in restraints, but did not ask questions about M.S.' statement that he knew Sebastian. At the conclusion of these interviews, the trial court asked counsel if they wanted to "inquire or be heard further on the issue as to what we've been doing this morning?" Counsel for both sides indicated that they did not wish to conduct further inquiry or argument. Before allowing the jury to resume deliberations, the court reminded the jury that "this case has to be decided on the evidence as you folks find it [and] on the law . . . which I have told you to follow and it's going to be decided fairly and impartially based upon the evidence and the law . . . ."

Following the jury's verdict, the defendant moved for a new trial because of M.S.' knowledge of Sebastian. The defendant also moved that the court summon M.S. and interview him to determine how he knew Sebastian, or in the alternative, that the defendant be allowed to interview M.S. The trial court denied the motions, reasoning that Sebastian's existence was not material to the charges against the defendant. The court also concluded that the failure of the defendant to request additional questioning of M.S. before the verdict precluded postverdict inquiry.

"Although the form and scope of . . . an inquiry [into juror misconduct] lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary

hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995).

"A defendant is entitled to have an impartial jury decide his case solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court. . . . It is well established, however, that not every incident of juror misconduct requires a new trial. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . Where, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 627–28, 682 A.2d 972 (1996).

In the present case, the defendant has not pointed to any actual prejudice created by M.S.' alleged conduct. The defendant was charged with possession of narcotics in his apartment and Sebastian's existence had no bearing upon the jury's finding that the defendant possessed those narcotics. The trial court, in denying the defendant's motion for a new trial, stated that: "I found

no reason whatsoever not to let this jury continue their deliberations. . . . Sebastian was a nonissue based on the way counsel presented the case, based upon the evidence, based upon the allegations, based upon what it [was the defendant] is alleged to have done, and the court is satisfied based upon what [J.P.] said and based upon what I knew because of the hearing that I held that there was no further reason to inquire." The trial court, having determined that the jury should continue its deliberations, also reminded the jurors that they must decide the case on the basis of the law and the evidence presented in the trial. "Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e have . . . accordingly confined our role to a determination of whether there has been an abuse of discretion. . . . Claims of juror misconduct fall within this rule of limited review." (Citation omitted; internal quotation marks omitted.) *State* v. *Small*, 242 Conn. 93, 113, 700 A.2d 617 (1997).

Furthermore, during two bench conferences and a meeting in chambers, the court repeatedly involved the defense counsel and the assistant state's attorney in deciding how to conduct the inquiry of the jurors. After the court interviewed J.P. about M.S.' comment, the defendant neither questioned M.S. about that comment nor requested that all of the other jurors be questioned individually about it. The trial court therefore reasonably declined to engage sua sponte in more extensive questioning, for "such questioning [could raise] concerns in the minds of jurors when none previously had existed." *State* v. *Mukhtaar*, 253 Conn. 280, 298, 750 A.2d 1059 (2000). The court explicitly gave both parties opportunities to conduct further inquiry, and both parties declined. Given "[t]he state['s] . . . strong interest

in the finality of judgments . . . and in protecting the privacy and integrity of jury deliberations"; (citation omitted) *State* v. *Brown,* supra, 235 Conn. 531; we conclude that, if the defendant perceived the trial court's inquiry as inadequate, then he would have complained during the inquiry process instead of waiting until after the jury had reached a verdict. Cf. *State* v. *Mukhtaar,* supra, 298 ("defense counsel's failure to seek any additional questioning or investigation by the court, despite repeated opportunities to do so, belies the defendant's assertion on appeal regarding the inadequacy of the court's action").

We conclude that the trial court properly denied the defendant's motion for a new trial and his request to summon or to question M.S. after the verdict.

The judgment is affirmed.

In this opinion the other justices concurred.