## STATE OF CONNECTICUT *v.* SERGIO VELASCO (SC 15881)

Callahan, C. J., and Borden, Norcott, Katz and Peters, Js.

---

Argued January 13—officially released March 30, 1999

*Christina M. Carroll*, with whom was *Gregory A. Klimaszewski*, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Mark S. Solak*, state's attorney, and *Mark A. Stabile*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CALLAHAN, C. J. The defendant, Sergio Velasco, was charged in an information with illegal possession of heroin in violation of General Statutes § 21a-279 (a), illegal possession of heroin with intent to sell in violation of General Statutes § 21a-278 (b) and illegal possession of heroin with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-279 (d).[1] Prior to trial, the defendant moved, pursuant to Practice

---

[1] General Statutes § 21a-279 (a) provides: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

General Statutes § 21a-279 (d) provides: "Any person who violates subsection (a), (b) or (c) of this section in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school and who is not enrolled as a student in such school or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of subsection (a), (b) or (c) of this section."

Book § 820 et seq., now § 41-12 et seq., and General Statutes § 54-33f, to suppress the heroin and certain personal items that had been seized from the defendant's person immediately following his arrest. The defendant maintained that those items should be suppressed because the warrantless search of his person and subsequent seizure violated his rights under both article first, § 7, of the Connecticut constitution, and the fourth amendment to the United States constitution.[2] After a hearing, the trial court granted the defendant's motion to suppress. Thereafter, the trial court dismissed the charges against the defendant.

The state, on the granting of permission by the trial court, appealed from the court's judgment to the Appellate Court. The Appellate Court concluded that "the defendant's arrest and the subsequent search and seizure were lawful," and reversed the judgment of the trial court. *State* v. *Velasco*, 47 Conn. App. 424, 434, 707 A.2d 286 (1998). We granted certification limited to the following issue: "Did the Appellate Court properly conclude that the trial court had incorrectly suppressed evidence in this case, under the totality of circumstances test as articulated in *State* v. *Barton*, 219 Conn. 529 [594 A.2d 917] (1991)?" *State* v. *Velasco*, 244 Conn. 905, 714 A.2d 3 (1998). We affirm the judgment of the Appellate Court.

The trial court found the following relevant facts. At approximately 1 p.m. on March 5, 1996, Detective

---

[2] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Warren Winkler, a nineteen year veteran of the Willimantic police department, received a telephone call from a confidential informant.[3] In the past, the informant had provided Winkler with information that had led to numerous arrests and convictions. The informant told Winkler that a person was selling heroin in a soup kitchen located in the basement of St. Paul's Church, which was near police headquarters. The informant described the person as a heavyset Hispanic male with a thick mustache, who was approximately five feet, five inches tall and appeared to be between thirty and thirty-five years old. The informant stated that the person conducted illegal narcotics transactions at the soup kitchen on a daily basis, usually in the morning. Finally, the informant told Winkler that he not only had observed the person selling narcotics in the soup kitchen, but also had purchased heroin from the person. At that point, Winkler instructed the informant to contact him if he again observed the person selling narcotics.

At approximately 10 a.m. the following morning, the informant called Winkler and told him that he had observed the same person make several sales of heroin at the soup kitchen that morning. The informant again described the person as a Hispanic male in his thirties, approximately five feet, five inches tall, with a thick mustache. The informant further stated that the person was wearing light colored pants and a light colored trench coat with green corduroy trim, and that the sleeves of the coat were rolled up.

Immediately after receiving the second telephone call from the informant, Winkler and three other plainclothes Willimantic police officers went to the soup

---

[3] Contrary to the trial court's factual findings, however, the record clearly reveals that Winkler actually met with the informant *in person* at police headquarters on the afternoon of March 5, 1996.

kitchen, where they observed the defendant, who matched the description provided by the informant. No one else present in the soup kitchen that morning matched the description. The officers themselves did not observe the defendant sell narcotics, nor did the defendant make an attempt to escape when the officers entered the soup kitchen.

Relying solely on the information that had been supplied by the informant, Winkler and the other officers then arrested the defendant. Immediately thereafter, and incident thereto, they searched the defendant and discovered six packets of heroin in his coat pocket.

The trial court made additional findings of fact. It found that the neighborhood in which St. Paul's Church is located is not an area of heavy drug trafficking. The Willimantic police department regularly uses undercover officers to observe and, in some cases, purchase drugs from suspected dealers. Although the police officers could have followed either or both of those procedures in the present case, they chose not to do so.

As a threshold matter, we set forth the appropriate standard pursuant to which we review a challenge to a trial court's granting of a suppression motion. " 'This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go.' *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22,

435 A.2d 24 (1980)." *State* v. *Zindros,* 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact.

Under both the federal and the state constitutions, a warrantless search and seizure is per se unreasonable, subject to a few well defined exceptions. *Katz* v. *United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State* v. *Miller,* 227 Conn. 363, 383, 630 A.2d 1315 (1993); *State* v. *Lewis,* 220 Conn. 602, 609, 600 A.2d 1330 (1991). One of those exceptions is a search incident to a lawful arrest. It is an established rule that a properly conducted warrantless search incident to a lawful arrest is itself lawful. *State* v. *Cobuzzi,* 161 Conn. 371, 373, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972); *State* v. *Collins,* 150 Conn. 488, 492, 191 A.2d 253 (1963). Thus, if the defendant's arrest was lawful, the subsequent warrantless search of his person also was lawful.

General Statutes § 54-1f (b) authorizes a police officer to conduct a warrantless arrest of "any person who the officer has reasonable grounds to believe has committed or is committing a felony." The phrase "reasonable grounds to believe" is synonymous with probable cause. *State* v. *Trine,* 236 Conn. 216, 236 n.16, 673 A.2d 1098 (1996); *State* v. *Love,* 169 Conn. 596, 599, 363 A.2d 1035 (1975).

The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is

made pursuant to a "totality of circumstances" test. *Illinois* v. *Gates*, 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991). With respect to warrantless arrests based upon information provided by a confidential informant, the trial court, in determining whether the arrest is supported by probable cause, is required to make a practical, nontechnical decision whether, under all the circumstances, including the "veracity" and the "basis of knowledge" of the person or persons supplying information, there is a *fair probability that the defendant had committed or was committing a felony. State* v. *Johnson*, 219 Conn. 557, 563, 594 A.2d 933 (1991).

I

Before we examine whether the Appellate Court, in reversing the contrary decision of the trial court, properly concluded that the police had probable cause to arrest the defendant, we need briefly to review the development of the probable cause doctrine. An appropriate starting point is the "two-pronged" test derived from the United States Supreme Court's decisions in *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The *Aguilar-Spinelli* test, as it is commonly known, provided a method for evaluating the existence of probable cause when an arrest or search warrant affidavit was based upon information supplied to the police by a confidential informant. Under the *Aguilar-Spinelli* test, the trial court was required to make two determinations: (1) whether the informant's veracity or reliability was established; and (2) whether there was a basis for the informant's knowledge regarding the information supplied. *State* v. *Ruscoe*, 212 Conn. 223, 228–29, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Delmonaco*, 194 Conn.

331, 338, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984).

In *Illinois* v. *Gates*, supra, 462 U.S. 213, the United States Supreme Court recognized an underlying flaw in the application of the *Aguilar-Spinelli* analysis. Specifically, the court noted that courts and commentators had regarded the two prongs of the *Aguilar-Spinelli* test to be entirely independent of each other, and each necessary to a finding of probable cause. As a result, courts had struggled to formulate rules regarding what types of information and what types of independent police corroboration might satisfy each of the prongs. Id., 229 n.4; see also 2 W. LaFave, Search and Seizure (3d Ed. 1996) § 3.3 (a), pp. 88–104. The court reasoned that the elaborate set of legal rules that had resulted from this emphasis on the independent character of the two prongs had led courts to dissect evidence relating to probable cause in an excessively technical manner. Consequently, the court abandoned the *Aguilar-Spinelli* approach. *Illinois* v. *Gates*, supra, 236–38. In its place, the United States Supreme Court established a "totality of circumstances" approach. Using the *Gates* methodology, a trial court must examine all of the evidence relating to the issue of probable cause and, on the basis of that evidence, make a commonsense, practical determination of whether probable cause existed, i.e., whether there was a fair probability that the defendant had committed or was committing a crime. Id., 238. The United States Supreme Court reasoned that the totality of circumstances approach was more consistent with the nature of a probable cause determination, which, as the court noted, "involves a practical, nontechnical conception." (Internal quotation marks omitted.) Id., 231, quoting *Brinegar* v. *United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).

Although we initially declined to follow the totality of circumstances approach in cases that implicated article

first, § 7, of the Connecticut constitution; *State* v. *Kimbro*, 197 Conn. 219, 230–31, 496 A.2d 498 (1985); in *State* v. *Barton*, supra, 219 Conn. 544, we revisited the issue and adopted the totality of circumstances test. Consequently, the analysis we now use to determine whether information supplied by a confidential informant satisfies the constitutional requirement of probable cause is the same under both article first, § 7, of the Connecticut constitution and the fourth amendment to the United States constitution. See id.

In rejecting the complex rules that had evolved from *Aguilar* and *Spinelli*, however, neither the United States Supreme Court's decision in *Gates*, nor our decision in *Barton* rejected the underlying concerns that originally had been expressed by the *Aguilar-Spinelli* inquiry. Rather, the *Gates* and *Barton* decisions both "reaffirmed that the 'veracity' or 'reliability' and the 'basis of knowledge' inquiries formulated in *Aguilar[-Spinelli]* remain 'highly relevant' in the determination of probable cause . . . ." *State* v. *Barton*, supra, 229 Conn. 537; see *Illinois* v. *Gates*, supra, 462 U.S. 230. In fact, both *Gates* and *Barton* stated that an informant's "veracity" or "reliability" and "basis of knowledge" "should be regarded as 'closely intertwined issues that may usefully illuminate the common-sense, practical question' of the existence of probable cause . . . ." *State* v. *Barton*, supra, 537.

Moreover, because the totality of circumstances approach provides only an *alternative method* for determining the existence of probable cause, it does not affect the quality or quantum of evidence necessary to establish probable cause. In other words, the totality of circumstances test simply allows a court to consider all the relevant evidence in determining whether probable cause exists; it does not increase the level of evidence necessary to support a determination of probable cause. Because the quantum of evidence necessary to

establish probable cause remains consistent regardless of whether a court applies the *Aguilar-Spinelli* or totality of circumstances test, it logically follows that evidence that would have satisfied the requirements of probable cause under the rigid *Aguilar-Spinelli* approach necessarily satisfies the requirements of probable cause under the more inclusive totality of circumstances approach.[4] To put it succinctly, probable cause is probable cause.

## II

In the present case, the trial court found that the informant had supplied the police with: (1) information on numerous other occasions that had led to arrests and convictions; (2) a detailed physical description of the defendant, including a description of what he was wearing; (3) the place and time of day that the defendant usually conducted his illegal narcotics transactions, and the type of drugs sold by the defendant; and (4) a self-incriminating statement that the informant had, in fact, purchased heroin from the defendant. Moreover, in its memorandum of decision, the trial court specifically determined that: (1) "the information which had been provided by the informant to the police in previous matters, which had led to convictions, constituted a sufficient basis to establish the informant's veracity"; and (2) "the informant's reported personal observation of narcotics sales by the defendant constituted a sufficient basis for the informant's knowledge that the defendant had engaged in illegal narcotic[s] transactions."[5]

[4] In support of his contention that evidence that would have supported a finding of probable cause under the *Aguilar-Spinelli* test (i.e., evidence establishing an informant's "veracity" or "reliability" and "basis of knowledge") does not necessarily require a finding of probable cause under the totality of circumstances test, the defendant makes reference to the decision of the New Jersey Supreme Court in *State* v. *Novembrino*, 105 N.J. 95, 519 A.2d 820 (1987). To the extent that *Novembrino* provides support for such a proposition, however, we find its reasoning unpersuasive.

[5] The defendant has not, on appeal, challenged the validity of these findings.

194

Despite its determinations regarding the informant's veracity and basis of knowledge, the trial court reasoned that, "[a]ttempts to corroborate the informant's tip were likely to help establish the defendant's guilt or innocence." Consequently, the trial court concluded that, under the totality of the circumstances test, the officers had not had probable cause to arrest the defendant. It is this conclusion with which the Appellate Court disagreed.

As the Appellate Court properly held, the trial court's conclusion that probable cause did not exist, however, is both legally and logically inconsistent with the trial court's factual findings. Examining the facts found by the trial court, including its specific determination that the evidence adequately established the confidential informant's "veracity" and "basis of knowledge," we conclude that the information supplied by the confidential informant, coupled with the police officers' verification of that information, provided the police with probable cause to arrest the defendant. See, e.g., *McCray* v. *Illinois*, 386 U.S. 300, 304, 87 S. Ct. 1056, 18 L. Ed. 2d 62 (1967) (information from reliable informant verified by direct observation sufficient to give police officers probable cause to make warrantless arrest); *United States* v. *Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) ("[i]t is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant"); *United States* v. *James*, 466 F.2d 475, 477 (D.C. Cir. 1972) (identifying information coupled with arresting officer's verification of this information is adequate probable cause for arrest). Because the information supplied to Winkler by the informant, by itself, was sufficient to establish the fair probability that the defendant was selling illicit drugs at the soup kitchen, the officers were not required

to corroborate that information through independent investigation prior to arresting the defendant.[6]

The facts found by the trial court established that the arrest of the defendant was lawful. As a result, the search and seizure conducted incident to that arrest also was lawful. Consequently, the Appellate Court properly concluded that the trial court incorrectly suppressed the heroin seized from the defendant's person.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[6] Although the trial court may have been correct in asserting that "[a]ttempts to corroborate the informant's tip were likely to help establish the defendant's guilt or innocence," such an assertion is entirely irrelevant to the determination of probable cause in the present case. Specifically, the determination of probable cause involves solely an examination of the information known to the police at the time of the arrest or search. It does not take into consideration what other steps the police could have taken to secure more evidence against the defendant. See *State* v. *Diaz*, 226 Conn. 514, 541, 628 A.2d 567 (1993). Moreover, the trial court's reference to the possibility that independent corroboration may have helped to establish the defendant's "guilt or innocence" overstates the requirements of probable cause. We previously have stated that "[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992).