# STATE OF CONNECTICUT *v.* CAINE COOPER
## (AC 19850)

Mihalakos, Flynn and Daly, Js.

Argued May 1—officially released September 11, 2001

*Deborah G. Stevenson,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Herbert E. Carlson, Jr.,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Caine Cooper, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4)[1] and from the trial

---

[1] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . .

"(b) Robbery in the first degree is a class B felony provided any person found guilty under subdivision (2) of subsection (a) shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

court's determination that he had violated General Statutes § 53-202k,[2] a sentence enhancement provision. On appeal, the defendant (1) claims that the double jeopardy clause of the fifth amendment to the United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut precluded the state from prosecuting him for the robbery, (2) claims that the evidence presented at his trial was insufficient to sustain his robbery conviction, (3) raises four claims that relate directly or indirectly to the events leading to his arrest, which occurred two days after the robbery, (4) claims that the pretrial identification procedures were unnecessarily suggestive and unreliable, and, therefore, the admission of the identifications of him violated his right to due process under the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut, and (5) claims that the court improperly concluded that he violated § 53-202k and, therefore, should not have enhanced his sentence by imposing a consecutive term of five years imprisonment. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 17, 1997, Peggy Cherniak drove to the Bradlees department store at 1250 Park Street in Hartford. The victim parked her vehicle in the store parking lot and entered the store. Upon completing her shopping, the victim exited the store and walked to her vehicle. While she was attempting to unlock the driver's side door, a vehicle entered the parking lot, circled around her and stopped. The sole occupant of that

---

[2] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

vehicle, the defendant, demanded, "Give me your pocketbook." The victim ignored him and continued to unlock her driver's side door. The defendant then exited his vehicle and approached the victim. He held a sawed-off, single-barreled shotgun to her back and told her that if she screamed he would shoot her in the head. He then repeated his demand for her pocketbook. This time, the victim surrendered her pocketbook, which contained, among other things, two or three credit cards that had been issued to her and $60 in cash. After taking the victim's pocketbook, the defendant began to retreat toward his vehicle. He reconsidered, however, and approached the victim again, demanding the keys to her vehicle. The victim surrendered her keys, and the defendant entered his vehicle and drove off.

The victim reentered Bradlees, and the police were summoned. The victim described the incident to the police and provided them with a description of the defendant. Two days later, the police arrested the defendant on an unrelated matter. While searching him incident to the arrest, the police found the victim's credit cards. Additional facts will be presented as necessary.

At the conclusion of the trial, the jury returned a verdict of guilty of robbery in the first degree. At the sentencing hearing, the court determined that, on the basis of the evidence presented at trial, the state had proven beyond a reasonable doubt that the defendant also had violated § 53-202k. On the robbery conviction, the court sentenced the defendant to a twenty year term of imprisonment, execution suspended after fifteen years, and five years probation. Pursuant to § 53-202k, the court imposed a mandatory consecutive five year term of imprisonment. This appeal followed.

I

The defendant claims that the state was precluded from prosecuting him for the May 17, 1997 robbery

because he previously had been acquitted in federal court of charges that, on May 19, 1997, he violated title 18 of the United States Code, §§ 922 (g) and 924 (a) (2) (criminalizing possession of firearm by felon), §§ 922 (k) and 924 (a) (2) (criminalizing possession of firearm having obliterated serial number), and title 26 of the United States Code, §§ 5841, 5861 (a) and 5871 (criminalizing possession of unregistered firearm). In support of his claim, the defendant relies on the double jeopardy clause of the fifth amendment to the United States constitution, and article first, §§ 8 and 9, of the constitution of Connecticut.[3] We conclude that the state was not precluded from prosecuting the defendant.

"The doctrine of double jeopardy is well settled under both the federal and state constitutions. The fifth amendment to the United States constitution provides in relevant part: '[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . .' This clause is applicable to the states through the fourteenth amendment and establishes the federal constitutional standard concerning the guarantee against double jeopardy. . . . The protection afforded against double jeopardy under the Connecticut constitution is coextensive with that provided by the constitution of the United States. Although the Connecticut constitution does not include a specific double jeopardy provision, the due process and personal liberty guarantees provided by article first, §§ 8 and 9, of the Connecticut constitution 'have been held to encompass the protection against double jeopardy.' . . . Furthermore, this court 'has long recognized as a fundamental principle of common law that no one shall be put in

---

[3] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

jeopardy more than once for the same offense.' " (Citations omitted.) *State* v. *Kasprzyk*, 255 Conn. 186, 191–92, 763 A.2d 655 (2001).

"The constitutional protection of accused persons against double jeopardy is intended to protect against a second prosecution for the same offense after acquittal, against a second prosecution after conviction, and against multiple punishments for the same offense. . . . But these protections apply only against a single sovereign authority. There is no constitutional prohibition against a state prosecution for the same acts which resulted in a federal prosecution . . . or vice versa." (Citations omitted.) *State* v. *Haskins*, 188 Conn. 432, 472, 450 A.2d 828 (1982). "[N]either federal nor state law bar[s] sequential prosecution in our state courts for an offense for which the defendant had been acquitted or convicted in a federal court." Id.; see also *State* v. *Moeller*, 178 Conn. 67, 69–70, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320 (1979).

In the present case, the defendant, in furtherance of his claim, has invited this court to consider his acquittal on the federal charges when determining whether the state was precluded from prosecuting him for the May 17, 1997 robbery. To do so, however, would contravene the principles of federalism and sovereignty discussed by our Supreme Court in *Haskins*. "It is not . . . within our province to overrule or discard the decisions of our Supreme Court." *State* v. *Vas*, 44 Conn. App. 70, 78, 687 A.2d 1295, cert. denied, 240 Conn. 910, 689 A.2d 474 (1997). Accordingly, we conclude that the state was not precluded from prosecuting the defendant for the robbery.

## II

Second, the defendant claims that the evidence presented at his trial was insufficient to sustain his convic-

tion for robbery in the first degree. Specifically, the defendant argues that the evidence was insufficient to support the jury's finding that he was the robber.[4] We disagree.

The following facts and procedural history are relevant to our resolution of the defendant's claim. The state, during its case-in-chief, called the victim as a witness. In the presence of the jury, the victim testified as follows. The perpetrator was a black male about five and one-half feet tall. During the incident, which lasted "two or three minutes," the perpetrator "was about three feet from [her]," and she "was looking right into his face." She had good eyesight, and her view of the perpetrator's face was unobstructed. He was not wearing a mask, a hat or sunglasses, and there was no precipitation. The victim identified the defendant as the perpetrator as he sat at the counsel table.

" 'In reviewing [a] sufficiency [of the evidence] claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Moreover, [t]his court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom.' . . . 'We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather,

---

[4] In his brief to this court, the defendant states: "From [the victim's] testimony the jury could infer that someone displayed or threatened the use of a firearm, but the state failed to prove beyond a reasonable doubt that the 'someone' was the defendant."

we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict.' . . . Moreover, '[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical.' " (Citations omitted.) *State* v. *Booth*, 250 Conn. 611, 654–55, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

In the present case, it appears from the record that the jury credited the victim's testimony identifying the defendant as the perpetrator. As previously indicated, we must defer to assessments of credibility. Additionally, construing the evidence in the light most favorable to sustaining the verdict, the victim's eyewitness testimony provides compelling direct evidence that the defendant was the perpetrator. Accordingly, we conclude that the jury reasonably could have concluded that the cumulative force of the evidence established beyond a reasonable doubt that the defendant was the robber.

### III

Next, the defendant raises four claims that relate directly or indirectly to the events that transpired at or near 58 Judson Street, Hartford, on May 19, 1997, two days after the robbery. Those claims are that (1) Densel Samuda, a Hartford police officer, violated the defendant's rights under the fourth amendment to the United

States constitution[5] and article first, § 7, of the constitution of Connecticut[6] when he entered 58 Judson Street and confiscated a shotgun, (2) the court improperly denied his motion to suppress the credit cards that Samuda had seized while searching him, (3) the court improperly denied his motion in limine to preclude the state from offering the shotgun and testimony concerning it, and (4) the court improperly denied his motion in limine concerning the credit cards that Samuda had seized while searching him. All four claims are grounded more or less in the procedural history that follows.

During the suppression hearing, the state called Samuda as a witness. Samuda testified as follows. On May 19, 1997, he was dispatched to 58 Judson Street to investigate a report that a black male wearing a white shirt and dark pants had a shotgun and was threatening to shoot someone. The caller reporting the incident had stated that the shotgun had been placed in a bag in the hallway of the building at that address. In response, Samuda parked his police car some distance from 58 Judson Street and proceeded to that address on foot to avoid detection. He was accompanied by several other officers. As they approached 58 Judson Street, he saw two black males on the porch of the apartment building at that address. One of them, the defendant,

[5] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The fourth amendment is made applicable to the states through the fourteenth amendment. See *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[6] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

matched the description provided by the caller. The police detained both men on the porch, "patted them down for weapons" and then "searched the area for any weapons."[7] In the hallway of the apartment building, Samuda discovered a black nylon bag containing a sawed-off, single-barreled shotgun. He confiscated the bag and shotgun and exited the building. He radioed the dispatcher and asked him to telephone the caller, and ask her to look out a window and indicate whether one of the men that had been detained was the person she had seen with the shotgun. Thereafter, the dispatcher radioed Samuda and indicated that the caller had identified the defendant. Samuda arrested the defendant and searched him; the search yielded several credit cards that had been issued to the victim. Samuda seized those credit cards. Later, Samuda learned that the caller was Rhonda Jones, who lived on the third floor of the building at 60 Judson Street.

The court denied the motion to suppress the credit cards as well as the motions in limine. In denying the motion to suppress, the court stated in relevant part: "Based on the evidence that was presented here in court, I conclude that Officer Samuda had probable cause to arrest the defendant for possession of the shotgun. He relied on information which was in possession of the police in general, including, in particular, the dispatcher, and was able to verify much of that

---

[7] We note that the defendant does not challenge the legality of the initial detention or the patdown search. "Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9] . . . of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. . . . If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search to discover weapons." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 281, 764 A.2d 1251 (2001).

information right there at the scene. This information, based as it was on the identifiable civilian complaint relayed to the officer on the scene by the police dispatcher, and the officer's ability to verify much of that information right there on the scene, including the clothing that the defendant was wearing and including, in particular, the fact that he could locate a shotgun exactly where the complaining witness said it would be, made that information that was in the possession of the police certainly trustworthy, certainly reasonably trustworthy. Certainly, this information was sufficient to cause the officer to believe that the defendant was in possession and control of the gun. . . . I conclude, therefore, that the arrest of the defendant was legal and that the search incident to that arrest was likewise legal." Additional procedural history will be presented as necessary. We now separately address each of the defendant's four claims.

## A

The defendant claims that Samuda violated his rights under the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut when he entered 58 Judson Street and confiscated the shotgun. We reject the defendant's claim because (1) during his trial, he conceded that he did not have standing to challenge those actions under the fourth amendment and (2) he did not properly brief his unpreserved state constitutional claim.

### 1

In *United States* v. *Salvucci*, 448 U.S. 83, 95, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980), the United States Supreme Court overruled *Jones* v. *United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), eliminating the rule that a criminal defendant automatically has standing under the fourth amendment to challenge the legality of a search that yielded evidence that incrimi-

nated him. "Under the automatic standing rule, a defendant had the right to challenge the legality of a search without first showing that he had a reasonable expectation of privacy that was violated by the search. *Salvucci* held that a defendant must first establish a reasonable expectation of privacy in the premises before he may assert that his fourth amendment rights have been violated by improper intrusion into those premises." *State* v. *Mitchell*, 56 Conn. App. 561, 565, 744 A.2d 927, cert. denied, 253 Conn. 910, 754 A.2d 162 (2000). "The defendant bears the burden of establishing the facts necessary to demonstrate a basis for standing . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92–93, 675 A.2d 866 (1996).

In the present case, the defendant's trial counsel did not attempt to establish that the defendant had a reasonable expectation of privacy in the hallway of 58 Judson Street. Furthermore, during the trial, defense counsel conceded that the defendant did not have standing under the fourth amendment to challenge the search of the hallway. In so doing, he stated: "[I] can't suppress [the shotgun] because it's not in a place [the defendant] has possession of. So, that's why I didn't move in my motion to exclude the shotgun under the fourth amendment because I recognize it wasn't an apartment in which he lived. He has no standing to make that claim." Thus, the record reveals that defense counsel believed that the defendant did not have standing and, therefore, intentionally declined to challenge on fourth amendment grounds Samuda's entry into the hallway. We conclude that defense counsel, during trial, specifically conceded the fourth amendment claim that the defendant has raised on appeal. Consequently, the defendant's fourth amendment claim does not qualify for appellate review. See *State* v. *Cobb*, 251 Conn. 285, 342–43, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

## 2

Second, the defendant maintains that article first, § 7, of the constitution of Connecticut embodies the doctrine of automatic standing. "Whether the state constitution embraces the principle of automatic standing remains an open question." *State* v. *Maia*, 243 Conn. 242, 242, 703 A.2d 98 (1997). In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), our Supreme Court set forth a six factor test for analyzing independent claims under the Connecticut constitution. "Those six factors are '(1) the textual approach . . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations.' . . . *State* v. *Geisler*, supra, [685]." *State* v. *Gibbs*, 254 Conn. 578, 599 n.20, 758 A.2d 327 (2000). In his brief to this court, the defendant did not include those factors in his analysis. Absent a proper analysis of the state constitution, we deem abandoned the defendant's state constitutional claim. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

## B

The defendant claims that the court improperly denied his motion to suppress the credit cards that Samuda had seized from his person while searching him incident to his arrest. Specifically, the defendant argues that his arrest was not supported by probable cause and, therefore, his rights under the fourth amendment were violated when Samuda searched him. We disagree.

As a preliminary matter, we set forth the standard of review. "Our standard of review of a trial court's

findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998). "When a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence. *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990) (reviewing factual findings in fourth amendment claims)." *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). Nonetheless, "[w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Ross*, 251 Conn. 579, 594, 742 A.2d 312 (1999). With that standard of review in mind, we consider whether the court properly ruled that the defendant's fourth amendment rights had not been violated when Samuda searched his person.

"Under both the federal and the state constitutions, a warrantless search and seizure is per se unreasonable, subject to a few well defined exceptions. . . . One of those exceptions is a search incident to a lawful arrest. It is an established rule that a properly conducted warrantless search incident to a lawful arrest is itself lawful. . . . Thus, if the defendant's arrest was lawful, the subsequent warrantless search of his person also was lawful.

"General Statutes § 54-1f (b) authorizes a police officer to conduct a warrantless arrest of 'any person who the officer has reasonable grounds to believe has com-

mitted or is committing a felony.' The phrase 'reasonable grounds to believe' is synonymous with probable cause.

"The determination of whether probable cause exists under the fourth amendment to the federal constitution . . . is made pursuant to a 'totality of circumstances' test." (Citations omitted.) *State* v. *Velasco*, 248 Conn. 183, 189–90, 728 A.2d 493 (1999). In determining whether a warrantless arrest is supported by probable cause, the court is required to make a practical, nontechnical decision whether, under all the circumstances, there is a fair probability that the defendant had committed or was committing a felony. See id., 190.

On appeal, the defendant does not specifically challenge the factual findings made by the court at the conclusion of the suppression hearing. Therefore, we assume that the court's factual findings are not clearly erroneous. The defendant, nonetheless, maintains that "the arrest was not lawful because it was based on previous illegal searches." In this appeal, the defendant has not successfully challenged any of the searches that led to his arrest. See footnote 7 and part III A. Additionally, the court's conclusion that there was probable cause to arrest the defendant is legally and logically correct, and is supported by the facts set out in the transcript of its oral decision. In sum, at the time of the defendant's arrest, there was a fair probability that he had committed or was committing a felony. See General Statutes § 53a-211 (possession of sawed-off shotgun a class D felony). Thus, the search that yielded the credit cards, i.e., the search that Samuda conducted incident to the defendant's arrest, was lawful. Accordingly, we conclude that the court properly denied the defendant's motion to suppress the credit cards.

C

The defendant claims that the court improperly denied his motion in limine to preclude the state from

offering evidence of, or testimony relating to, the shot-gun that Samuda confiscated at 58 Judson Street. In his motion, the defendant argued that "[s]uch evidence is extremely prejudicial and has no probative value." The record discloses, however, that neither the state nor the defendant offered such evidence. "Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 638. Even if we assume arguendo that the court's ruling was improper, the defendant, nonetheless, has failed to prove that the alleged impropriety harmed him because the evidence he unsuccessfully sought to exclude was never in fact introduced. Therefore, we reject the defendant's claim.

## D

In his brief, the defendant raises the following evidentiary claim concerning the credit cards that Samuda seized while searching him: "The state failed to prove at all the manner in which the defendant received the cards. The credit cards were also proof of debt and as such cannot be proven by hearsay and so were not relevant or material, yet they were deemed admissible and proven by hearsay. Because the credit cards were destroyed at the direction of the state, and because the defendant was prejudiced thereby, they should have been excluded from evidence." That claim is virtually unintelligible, especially considering that the court found that the credit cards had been destroyed prior to trial pursuant to a court order.[8] Additionally, the

[8] We note that the court found (1) that the credit cards had been destroyed pursuant to a court order that had been issued inadvertently, (2) that the credit cards, if available, "would be more likely to incriminate the defendant than to exonerate him" and (3) that "it [was] more prejudicial to the state that the actual cards were not available." On appeal, the defendant does not challenge those findings.

defendant provides no legal analysis for his argument and cites no authorities to support it. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Shashaty*, 251 Conn. 768, 772 n.4, 742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000). We therefore decline to review the defendant's claim.

## IV

The defendant next claims that the pretrial identification procedures were unnecessarily suggestive and unreliable, and, therefore, the admission of the identifications of him violated his right to due process under the fourteenth amendment to the United States constitution[9] and article first, § 8, of the Connecticut constitution.[10] We disagree.[11]

---

[9] The fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[10] We note that in presenting his claim, the defendant has not offered separate and independent analysis under the state constitution. We therefore analyze the defendant's claim as he has presented it, namely, as governed by federal constitutional principles. See *State* v. *Cobb*, supra, 251 Conn. 307 n.14.

[11] In his brief, the defendant also raises two claims concerning the victim's in-court identification of him. First, the defendant claims that the identification was tainted by the pretrial identification procedures and, therefore, his right to due process was violated. "An in court identification must be excluded, as violative of due process, only if it is the product of an unconstitutional pretrial identification procedure." *State* v. *Tatum*, 219 Conn. 721, 726–27, 595 A.2d 322 (1991). Because we conclude that the pretrial identification procedures were constitutional, the defendant's claim no longer is viable. See id.

Second, the defendant claims that during his trial, the prosecutor improperly directed the victim's attention to the defendant, tainting the in-court identification. The record discloses that the defendant's claim is unpreserved. "When a claim is raised for the first time on appeal, our review of the claim is limited to review under either the plain error doctrine; [see Practice Book § 60-5]; or *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)]." *State* v. *Barnett*, 53 Conn. App. 581, 600, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999). The defendant did not request

The following procedural history is relevant to our disposition of the defendant's claim. Prior to his trial, the defendant filed a motion titled, "Motion to Suppress Identification," in which he asked the court to suppress "any pretrial or in-court identification of the defendant which the state intends to use at the defendant's trial." After conducting a hearing, the court issued an oral ruling denying the motion. That oral ruling, which contains findings of fact, is reproduced below in relevant part.

"This robbery occurred on May 17, 1997. Three days later, the police assembled an array of photographs, of eight photographs, one of which was a front view of the defendant. The other photographs were also of front views of other people of a basically similar appearance. [The victim selected the defendant's photograph.] The next event that occurred was that [the victim's] son, who is a sergeant in the Hartford police department, called her and told her that the police had arrested someone who had her credit cards on him at the time. On May 23, the police arranged for [the victim] to view a second array of photographs. . . . The second array consisted of eight photographs, seven new people plus the defendant, and each photograph was a typical police mug shot showing both a front and profile view of the same person. . . . [A]t that time, [the victim] again picked the defendant's photograph, saying, 'That's him.'

"The circumstances of the viewing of the first array was—there was no evidence in my view that there was anything suggestive about that. Pretty straightforward showing by the police of a stack of photographs without any kind of suggestion one way or the other as to even

review of his claim under either of those doctrines. " 'As this court has previously noted, it is not appropriate to engage in a level of review that is not requested.' *State* v. *Hermann*, 38 Conn. App. 56, 65, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995)." *State* v. *Barnett*, supra, 600. Accordingly, we decline to review the defendant's claim.

whether the person—even whether the person the police thought was involved was in that stack. They just said look and see, and she picked out the defendant's pictures, saying she's 90 percent sure or perhaps entirely sure that it was him. There was nothing suggestive about that and so, therefore, the motion, at least as it relates to that first array, must be denied.

"With respect to the second array, whether it was at the insistence of the police or whether it was as a result of a request by the victim . . . that clearly was suggestive. Clearly, it was a suggestive procedure. . . . They got a mug shot, they put it in with seven other people, they brought her to the police headquarters and indicated the reason for doing so was . . . so that she could be sure of her prior identification. So, clearly, there was something more suggestive about that second array than about the first.

"However, in my view the victim's identification of the defendant in that second array was clearly reliable. We'll remember that the victim had a good opportunity to view the defendant, the perpetrator, at the time of the crime. The crime took place in daylight, she had two to three minutes of an encounter with the defendant, she was very close up to him, probably less than three feet, she saw him under different circumstances. She saw him over her shoulder while he was holding something hard up against her back, she saw him when he came back to get her keys after he was about to leave; her attention, at least based on her testimony here, was very focused at the time. She was definitely frightened, but she made an effort to look at the perpetrator by looking over her shoulder at him. The description that she gave to the police generally matched that of the defendant at the time, and her certainty at the time she made the identifications ranged from 90 percent to what I might call 100 percent.

"So, based on those factors, I find that her identification of the defendant in the second array was reliable, certainly sufficiently reliable to overcome the suggestibility that was inherent in that procedure. I find that it's insignificant that at the second array, she was shown both a front and profile view of the defendant and the other people in the array. I also find that it was insignificant that there weren't any repeats from the first array to the second array except for the defendant. Indeed, the fact that there were seven new people in the second array merely expanded the pool from which the victim had to select out the defendant. So, for all of those reasons, I find that the motion to suppress the identification procedure should be denied."

Before addressing the merits of the defendant's claim, we set forth the standard of review and the legal principles that govern our analysis. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"[R]eliability is the linchpin in determining the admissibility of the identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed

against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]. . . .

"[W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Citations omitted; internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 554–56, 757 A.2d 482 (2000).

In the present case, the defendant does not challenge any of the court's factual findings. Nonetheless, we have carefully reviewed the record of the hearing and conclude that the court's findings of fact are adequately supported by the evidence. The defendant does, however, challenge as unreasonable the ultimate inferences that the court drew from those findings, namely, that (1) the first photographic array was reliable and was not suggestive, and (2) the second photographic array was reliable. We conclude that the court properly determined that the photographic arrays were reliable because the court's factual findings, including the opportunity that the victim had to observe the defendant during the robbery, reasonably support the inference that during her viewing of each array, there did not exist a very substantial likelihood that the defendant would be misidentified. See id., 555–56. Because the defendant has the burden of showing, inter alia, that

the court's determination concerning reliability was improper; see id., 554–55; we conclude that the court properly denied the defendant's motion.

V

Last, the defendant claims that the court improperly failed to instruct the jury on the elements of § 53-202k and that, as a result, the court, instead of the jury, considered whether the state had proven that he had violated § 53-202k. Therefore, the defendant argues, the case must be remanded with direction to vacate the five year consecutive sentence imposed by that court pursuant to § 53-202k. The state concedes that the court failed to instruct the jury on § 53-202k, but maintains that the omission was harmless because the guilty verdict on the underlying felony necessarily included a finding that the defendant had met the requirements for a sentence enhancement under § 53-202k. We reject the defendant's claim that the sentence imposed under § 53-202k must be vacated.

The following facts and procedural history are relevant to our resolution of the defendant's claim. During his sentencing hearing, the defendant argued that the evidence presented at his trial did not indicate whether the shotgun he had used to threaten the victim was operable. Therefore, the defendant claimed, he was not subject to an enhanced sentence under § 53-202k.[12] The state, in response, declined to seek an enhancement under § 53-202k, noting that the enhancement had not been submitted to the jury for consideration. The court concluded that an enhancement under § 53-202k was appropriate, however, and imposed a total effective sentence of twenty-five years imprisonment, execution

[12] We note that the state was not required to prove that the firearm that the defendant used was operable to obtain a proper sentence enhancement under General Statutes § 53-202k. See State v. Tinsley, 47 Conn. App. 716, 721–22, 706 A.2d 1008, cert. denied, 244 Conn. 915, 713 A.2d 833 (1998).

suspended after fifteen years, and five years probation. That sentence included the additional, mandatory, non-suspendable five year term of imprisonment prescribed by § 53-202k. The enhancement increased the defendant's penalty beyond the maximum term authorized by statute for his underlying robbery conviction. See General Statutes §§ 53a-134 (b) (robbery in first degree is class B felony) and 53a-35a (twenty year maximum term on all class B felony convictions except manslaughter in first degree with firearm).

Before addressing the merits of the defendant's claim, we set forth the legal principles that guide our analysis. "Section 53-202k was enacted 'as part of a comprehensive legislative plan for dealing with assault weapons.' . . . It provides for a mandatory five year term of imprisonment whenever a defendant, 'in the commission of [any class A, B or C] felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3 . . . .' General Statutes § 53-202k. As we stated previously, the five year sentence runs consecutively with, and is in addition to, the sentence imposed for the underlying felony." (Citation omitted.) *State* v. *Velasco*, 253 Conn. 210, 220, 751 A.2d 800 (2000). In a jury trial, if the state has accused a defendant of violating § 53-202k, the jury must determine whether the state has proven the elements necessary for a sentence enhancement under that section. See id., 226–27 (in enacting § 53-202k, legislature did not intend to eliminate role of jury as fact finder). Additionally, because a finding under § 53-202k *exposes* a defendant to a penalty beyond the prescribed statutory maximum for the underlying offense, the sixth and fourteenth amendments to the United States constitution[13]

[13] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

require the state to prove the elements of § 53-202k beyond a reasonable doubt. See *Apprendi* v. *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

Nonetheless, although a court is required to have the jury determine whether the state proved that the defendant is subject to a sentence enhancement under § 53-202k, failure to do so can constitute harmless error. See *State* v. *Davis*, 255 Conn. 782, 793–94, 772 A.2d 559 (2001); *State* v. *Velasco*, supra, 253 Conn. 233; see *Neder* v. *United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (harmless error rule of *Chapman* v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967], applies to jury instruction that omits element of offense). Such an error is harmless only if it appears beyond a reasonable doubt that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed on the elements of that section and been permitted to determine whether the state had satisfied its burden of proof. See *Neder* v. *United States*, supra, 15 (test for harmlessness "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained'," quoting *Chapman* v. *California*, supra, 24).

In the present case, it is undisputed that the court failed to instruct the jury on either of the two elements of § 53-202k. The jury, by virtue of finding the defendant guilty of violating § 53a-134 (a) (4), necessarily found, however, that he had committed a class B felony. See General Statutes § 53a-134 (b). Therefore, the jury, in effect, made the factual determination with respect to the first element of § 53-202k, which is the commission of a class A, B or C felony, in favor of the state.

Section 53-202k also requires the state to prove that the defendant, in the course of committing that underlying class A, B or C felony, had "use[d], or [had been] armed with and [had] threaten[ed] the use of, *or [had] display[ed], or [had] represent[ed] by his words or conduct that he possesse[d] any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a* . . . ." (Emphasis added.) In the present case, the state charged the defendant by information with violating §§ 53a-134 (a) (4) and 53-202k. Specifically, the state charged as follows: "[O]n or about May 17, 1997, at approximately 10:50 a.m., at or near 1250 Park Street, Hartford, Connecticut, the said Caine Cooper, when in the course of the commission of the crime of Robbery as defined in section 53a-133 of the Connecticut [General] Statutes, *he displayed or threatened the use of what was represented by his words or conduct to be a shotgun or other firearm*, in violation of § 53a-134 (a) (4); and § 53-202k of the Connecticut General Statutes." (Emphasis added.)

Following the close of evidence, the court, in its instructions to the jury, stated: "Robbery becomes robbery in the first degree, as charged in this case, when the person committing the robbery displays or threatens the use of what he represents by words or conduct to be a firearm. . . . So, let me summarize the elements of robbery in the first degree in the context of this case. . . . And [element] four, that during the course of committing those acts, the defendant displayed or threatened the use of an object that he represented by his words or by his actions to be a firearm." As previously discussed, the jury returned a verdict of guilty of robbery in the first degree.

An examination of the information, the jury instructions and the verdict reveal that the verdict was predicated on a finding that the defendant, in the course of the robbery, either had displayed a firearm or had

represented by his words or conduct that he possessed a firearm. Additionally, the evidence indicating that that firearm was a shotgun was overwhelming and uncontroverted, in part because the defendant did not contest that issue at trial.[14] See *State* v. *Davis*, supra, 255 Conn. 795. For those reasons, we conclude that the record establishes beyond a reasonable doubt that the defendant, in the course of committing the robbery, displayed or represented that he possessed, a shotgun. See *Neder* v. *United States*, supra, 527 U.S. 17–19 (jury instruction that omits essential element of offense constitutes harmless error if reviewing court concludes beyond reasonable doubt that omitted element was uncontested and supported by overwhelming evidence); *State* v. *Davis*, supra, 794; *State* v. *Velasco*, supra, 253 Conn.

---

[14] The evidence presented at the trial included the following testimony that the state elicited from the victim during its direct examination of her:

"[Prosecutor:] All right. Now, then after [the defendant] said these words to you, and you're very close, as you've testified, what happens next?

"[The Witness:] He said to me again, he says, 'I said give me your pocketbook.' So, I gave it to him, and he turned around and started back to his car and then he turned around and he said to me, 'And give me your keys.'

"[Prosecutor:] Okay. Now, when—when you—he said to you another time give me your purse, okay, and you did?

"[The Witness:] Yes.

"[Prosecutor:] Why did you do that?

"[The Witness:] Because I didn't want to get killed. He had a gun in my back.

"[Prosecutor:] Okay. All right. When in sequence was it that you first saw or felt this gun?

"[The Witness:] When he got out of his car and came over to me?

"[Prosecutor:] All right. Tell us what it is that you saw him have when he got out of the car?

"[The Witness:] Well, he had a single-barreled shotgun.

"[Prosecutor:] All right. And how were you able to say he had a—well, I'll withdraw that. What factor or factors, you know, did you have which would allow you to say this is a shotgun? What experience or whatever?

"[The Witness:] The only experience I've ever had with a gun is my grandfather, which is—lives in Tennessee, used to have guns sitting around his house a lot.

"[Prosecutor:] Okay. And can you tell us how long this shotgun was?

"[The Witness:] It was a sawed-off shotgun.

"[Prosecutor:] Okay. How could you tell it was a sawed-off?

"[The Witness:] 'Cause I saw it."

232–33. Because shotguns are included in the definition of "firearm"; see General Statutes § 53a-3 (19); but are not included in the definition of "assault weapon"; see General Statutes § 53-202a; the record, therefore, reveals that the state established beyond a reasonable doubt the second element of § 53-202k. Accordingly, we conclude that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed properly on the elements of that section and permitted to determine whether the state had satisfied its burden of proof. In sum, the impropriety claimed by the defendant was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.