# STATE OF CONNECTICUT *v.* MICHAEL WRIGHT
## (AC 20509)

Schaller, Mihalakos and Dranginis, Js.

Argued January 18—officially released July 9, 2002

*Michael O. Sheehan*, special public defender, with whom were *Carmine J. Giuliano*, special public defender, and, on the brief, *Sarita Ordonez* and *Richard A. Reeve*, special public defenders, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Warren Maxwell*, senior assistant state's attorney, and *David Zagaha*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Michael Wright, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1), 53a-8 and 53-202k, conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48, 53a-59 (a) (1) and 53-202k, which judgment included an enhanced sentence pursuant to § 53-202k.[1] He claims that the trial court violated his due process rights when it (1) denied his request for a continuance of his trial until a coconspirator was sentenced and (2) enhanced his sentence pursuant to § 53-202k with a five year consecutive term without first instructing the jury on the commission of a class A, B or C felony with a firearm. We affirm the judgment of the trial court.

---

[1] The state also charged the defendant with murder in violation of General Statutes §§ 53a-54a, 53a-8 and 53-202k, conspiracy to commit murder in violation of General Statutes §§ 53a-48, 53a-54a and 53-202k, and tampering with a witness in violation of General Statutes § 53a-151. The jury acquitted him of the charge of conspiracy to commit murder, and failed to reach a verdict on the murder and tampering charges. The court declared a mistrial as to those two charges.

The following facts are necessary for our resolution of the defendant's appeal. The defendant was arrested on May 2, 1997, and charged in connection with the July 24, 1996 shooting death of Hayfield "Pit Bull" Hemly. A codefendant, Marlon Hamilton, was arrested at the same time and charged with having committed the same offenses. Although the defendant and Hamilton were to begin their joint trial in May, 1999, the court instead severed the trials. Subsequently, Hamilton entered a guilty plea to the charge of assault in the first degree in exchange for his cooperation with the state. According to the terms of the plea agreement, Hamilton would not be sentenced until the conclusion of the defendant's trial.

The defendant's trial began on October 18, 1999. On November 2, 1999, the defendant attempted to call Hamilton as a witness to testify about exculpatory information concerning crimes with which the defendant was charged. Hamilton invoked his fifth amendment privilege against self-incrimination and refused to answer defense counsel's questions. The defendant sought a continuance of the trial until after Hamilton was sentenced, anticipating that the protections afforded to Hamilton would no longer be available. The court denied the request. On November 12, 1999, the jury convicted the defendant of the crimes of assault in the first degree and conspiracy to commit assault in the first degree. The court sentenced the defendant to forty-five years imprisonment, suspended after thirty-five years, and five years probation. Specifically, the court sentenced the defendant to twenty years on the basis of the assault conviction, plus a five year sentence enhancement, pursuant to § 53-202k, consecutive to that twenty years, and twenty years consecutive, execution suspended after ten years, for the conspiracy conviction.

I

The defendant first claims that the court violated his due process rights under the fifth amendment of the United States constitution in denying his request for a continuance of his trial until Hamilton was sentenced. We disagree.

The defendant contends that the denial of his request for a continuance infringed on his right to offer the testimony of a witness and violated his right to due process of law. Although not fully stated as such, his claim alleges a violation not only of his fifth amendment due process rights, but also his sixth amendment right to present a defense.[2]

The following additional facts are necessary for the resolution of the defendant's claim. Hamilton had accused Steve Nelson of stealing marijuana from him the week before the shooting. Nelson and the victim had met with Hamilton several days before the shooting and attempted to explain to Hamilton that someone else had stolen the drugs. During the meeting, Nelson and the victim flashed their guns. During the late evening of July 24, 1996, the victim and Nelson drove to Adams Street in Hartford, where they met with friends. The defendant and Hamilton arrived separately later in the evening. Thereafter, Nelson and the victim became involved in a melee with the defendant and Hamilton over the stolen marijuana, which precipitated the shooting death of the victim.

---

[2] "The sixth-amendment right of a criminal defendant to have compulsory process for obtaining witnesses in his favor is applicable to state criminal proceedings under the due process clause of the fourteenth amendment . . . and included within its scope is the right to offer the testimony of witnesses. The rights of compulsory process and due process of law may be violated by the denial of a continuance which prevents a defendant from presenting witnesses on his behalf." (Citation omitted.) *State v. Bethea*, 167 Conn. 80, 82–83, 355 A.2d 6 (1974), citing *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

At trial, the state called several witnesses to testify about the events of the evening. Five people present at the scene of the shooting testified for the state, including Nelson, Steve O'Meally, Michael Lawrence, Joseph Lindsey and Franz Murray. A sixth witness, Oreville Lipscome, also testified for the state. Nelson, the first witness called by the state, testified that he witnessed the fight. He stated that he was about two feet from the victim as Hamilton and the defendant began to "beat" and "strike" the victim in the head with guns, and that he tried to intervene. Nelson testified further that after about thirty seconds, the victim broke away from his assailants and ran along the street. Nelson testified that he chased and ran past the victim, heard shots and looked back to see the victim lying in the street. Nelson did not see the shots fired.

The remaining witnesses all testified that Hemly was beaten, or "pistol-whipped," prior to fleeing along Adams Street, and that he was shot while running and that he fell in the street. All of those witnesses testified that the defendant had a gun at the time of the shooting, and all except Lipscombe stated that the defendant had "pistol-whipped" the victim. Several witnesses stated that Hamilton also struck the victim, either with a gun or with his fists. During the fight, a shot was fired and everyone fled. All but one of the witnesses to the shooting also testified that the defendant alone shot the victim.[3] The testimony established that the victim ran along the street as the defendant moved into the middle of the street, dropped to his knees and fired two to four shots at the victim. The state rested its case

---

[3] Nelson stated that he heard the shots fired only as he ran. We note that Lindsey testified that he was not present at the time of the shooting and that he related what other people had told him. Nevertheless, he testified that he "saw" Hamilton, after the defendant had shot the victim, walk over to the victim, who was lying in the street, and that Lindsey then "heard" two shots.

on November 1, 1999, without calling Hamilton to testify against the defendant.

The defense began its case on November 2, 1999. The next day, the defendant informed the court, outside of the presence of the jury, that he intended to call Hamilton to the witness stand. Hamilton's attorney informed the court that Hamilton's case was pending and that he intended to refuse to answer questions on fifth amendment[4] grounds. The defense then called Hamilton to the witness stand, and he invoked his fifth amendment protections.[5] The court upheld Hamilton's assertion of his fifth amendment protections. It also denied the defendant's request to have Hamilton exercise that privilege with the jury present.

Relying on *State* v. *Williams*, 200 Conn. 310, 511 A.2d 1000 (1986), the defendant sought a continuance until after Hamilton's sentencing, arguing that Hamilton would no longer have a fifth amendment privilege at that time. The defendant contended that by continuing Hamilton's sentencing until after the defendant's trial, the state had created an "artificial sentencing date," preventing the defendant from calling Hamilton as a witness.

In response, the state explained its plea agreement with Hamilton and its bearing on its case against the defendant. Unsure whether the witnesses identified in the file would be available at the defendant's trial and convinced of the defendant's responsibility for the killing, the state decided to ensure that it would have the testimony sufficient to convict by offering Hamilton the plea agreement. He agreed, and on May 28, 1999, gave

---

[4] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[5] Upon calling Hamilton to the witness stand, the defendant asked him about the night of the shooting, the existence of the conspiracy and whether he had received consideration for his guilty plea.

a statement to the police describing the events leading to and including the shooting, and describing his and the defendant's roles. The plea agreement called for Hamilton to plead guilty to one count of assault in the first degree while leaving the other counts open. On the day that Hamilton was to give his statement, defense counsel informed the state's attorney that he possessed some "coded"[6] letters written by Hamilton and addressed to the defendant, which he believed inculpated Hamilton in the shooting. The state ordered its inspector to review the letters with Hamilton and thereafter concluded that they contained no inference of admissions by Hamilton.

The state then summarized the situation, stating that "that's where we stand now. . . . He pleaded to one count. It was continued by the court for sentencing to ensure, now it has nothing to do with anything else, to ensure his continued cooperation with me. [The state's attorney's office] [didn't] want to sentence him beforehand for fear he might turn around and say something different." Ultimately, the state did not call Hamilton to testify. The state informed the court that it decided not to call him because of the last minute availability of testimony from Lawrence and Kevin Pinnette, a witness who came forward subsequent to the Hamilton plea agreement. The prosecutor stated that "[h]ad [the state] had them in the first place, [it] never would have made [the plea] agreement with [Hamilton's attorney]."

The defendant argued that delaying Hamilton's sentencing violated the defendant's due process rights in that his right to defend himself outweighed Hamilton's rights. In support of his claim, the defendant argued that the state could have given Hamilton immunity or could have called him as its witness. The state responded that it had intended to call Hamilton as a

---

[6] One of the letters contained the index to the code.

witness, but that Hamilton's counsel had advised him to invoke the fifth amendment and that the state had not done so.

The court denied the request for a continuance, although it clearly appreciated the complexity of the question involved.[7] The court then granted the defendant's request that the letters purportedly from Hamilton to the defendant be marked as exhibits for identification. The defendant called an inspector from the state's attorney's office to give testimony authenticating Hamilton's statement on the theory that it was exculpatory to the defendant[8] and against Hamilton's penal interest. The state objected to the statement on the ground of inadmissible hearsay, but the court overruled the objection. The court noted, inter alia, that the conspiracy charges against Hamilton still were open,

[7] In its ruling, the court stated to defense counsel: "This is a matter for practicality here. Let's say that I say all right, we are going to continue this case until Mr. Hamilton is sentenced. And then let's say the state says in Hamilton's case, this is hypothetical of course, well, we're withdrawing our offer because it's contingent on Hamilton cooperating in the [defendant's] case and Hamilton is not cooperating. So, he can withdraw his plea and we put him on trial."

After further colloquy with the defense and the state, the court issued its ruling: "I think, under all these circumstances, I will not continue this case until such time [as] Mr. Hamilton may be sentenced because I think that's, essentially, an indefinite continuance based on the circumstances that [the prosecutor has] explained. . . . [S]o, we could just have an infinite period of time. Hamilton wouldn't be sentenced, and [the defendant] would never be tried. I don't think that's—and justice wouldn't be served for anybody under those circumstances."

[8] Defense counsel stated the grounds for the admission of Hamilton's statement as follows: "[I]t either involves Hamilton [as] a conspirator or it doesn't. Either way, I would argue that it's admissible. If it doesn't involve the conspirator, then it's exculpatory to my client. If it does involve him as a conspirator, then it goes to the weight of the evidence that somebody else committed the crime."

We note that the defendant on appeal characterizes the import of the statement differently. He complains that because the court's prior denial of the request for a continuance barred him from questioning Hamilton, he was "reduced to presenting Hamilton's statement, which clearly inculpated [the defendant] and exculpated [Hamilton]."

that the statement put Hamilton at the scene of the crime and that it could, therefore, be construed as against his penal interest despite Hamilton's plea agreement as to the assault charge. The statement described the events leading to and including the shooting and, ultimately, implicated the defendant in the killing.[9]

At sentencing, the defendant sought a judgment of acquittal on the ground that by setting an uncertain, future sentencing date for Hamilton, and denying the defendant's request for a continuance on that basis, the court deprived him of his due process rights. The court denied the motion, citing its earlier ruling on the motion for a continuance.

We begin by articulating the appropriate standard of review. As the defendant correctly notes, the *Williams* court stated that "the matter of a continuance is traditionally within the discretion of the trial judge which will not be disturbed absent a clear abuse. . . . It is not every denial of a request for a continuance that violates due process. . . . [T]he right of a defendant to a continuance is not absolute . . . ." (Citations omitted; internal quotation marks omitted.) Id., 320. We also note that subsequent to *Williams*, our Supreme Court clarified the procedure for evaluating a court's exercise of discretion in ruling on a motion for a continuance. "To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial

[9] The defendant had the state's inspector read from Hamilton's statement, which related Hamilton's recollection that he "saw [the defendant] in the middle of Adams Street with a gun, and I heard two or three shots."

judge at the time the request is denied." (Citation omitted; internal quotation marks omitted.) *State* v. *Hamilton*, 228 Conn. 234, 240, 636 A.2d 760 (1994), citing *State* v. *Beckenbach*, 198 Conn. 43, 47–48, 501 A.2d 752 (1985). The *Hamilton* court went on to note with approval a list, albeit not an exhaustive one, of several factors that the trial court may consider in exercising its discretion.[10] The factors include "the timeliness of the request for continuance; the *likely* length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." (Emphasis added.) *State* v. *Hamilton*, supra, 240.[11]

The Supreme Court clarified "that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." Id., 242. Accordingly, in addressing the defendant's arguments we also will address the relevant factors previously listed that the record before us discloses.

---

[10] We note that although *Hamilton* informs us that the list is not exhaustive, we construe it not to be a checklist representing those factors that must, at a minimum, be discussed. Rather, it is a list of highly relevant factors that we, as an appellate court, may consider and should view as particularly persuasive in evaluating the trial court's exercise of its discretion.

[11] Although we note that the Supreme Court went on to discuss factors useful in assessing prejudice to the defendant in the event of an abuse of the court's discretion; *State* v. *Hamilton*, supra, 228 Conn. 241; in light of our conclusion as to the trial court's exercise of its discretion, we need not apply those factors for the disposition of the defendant's claim.

The defendant, quoting *State* v. *Williams*, supra, 200 Conn. 320, argues on appeal that once the court permitted Hamilton to invoke his fifth amendment privilege during the defendant's trial, "the unique interest that the defendant had in a continuance in order to get that testimony before the trial jury became more significant." Although the *Williams* court found that the trial court in that case had abused its discretion in denying the defendant's motion for a continuance; id., 321; it did so after considering at least two of the factors that later were collected and discussed in *Hamilton*. The sole fact that the codefendant invoked the fifth amendment privilege in this case, while clearly calling for the court's careful resolution of the issue presented, does not necessarily demand that the court grant the continuance. See *State* v. *Bethea*, 167 Conn. 80, 84–87, 355 A.2d 6 (1974); *State* v. *Mendez*, 45 Conn. App. 282, 286–87, 696 A.2d 352 (1997). After our review, we conclude that *Williams* is distinguishable on its facts from the case at hand.

First, we note that in *Williams* the joint trial of the defendant and his codefendant was severed on the defendant's motion. Specifically, the defendant wanted to call his codefendant to testify, consistent with the defendant's previous statement to the police, that he lacked an accomplice in the robbery for which they both were accused. *State* v. *Williams*, supra, 200 Conn. 313–14.

Here, the defendant waited until the state concluded its case to make his request, thereby implicating the timeliness of the request. The defendant argues that although he did not attempt to call Hamilton until the state rested its case on November 1, 1999, that should not count against him, as he had assumed all along that the state would call Hamilton. He also argues that the state's tactical choice not to call Hamilton should not be sanctioned as a means to prevent the defendant from

calling that witness.[12] The defendant argues that "[t]his was the first opportunity to raise this issue, as the state had not advised the defense of its changed position prior to its decision not to call Hamilton as a witness."

In response, the state places the responsibility squarely on the defendant for any perceived disadvantage that was worked on him due to the timing of his request. The state notes that the defendant made no effort to secure Hamilton's testimony until the trial was almost over. Specifically, the state argues that the defendant made a tactical choice in relying on Hamilton to cooperate and testify for the state, which would have permitted the defendant to cross-examine Hamilton at that time. The fact that the state decided not to call him is no more the genesis of the defendant's perceived disadvantage than the defendant's failure to urge the court to schedule his trial after Hamilton's sentencing.

---

[12] The defendant implies that the state was disingenuous in naming Hamilton as a witness and then deciding not to call him at the last minute because of the availability of the two witnesses, Pinnette and Lawrence. The defendant cites the prosecutor's statement to the court that had he known in May, 1999, that they would be available to testify, he "never would have made [the plea agreement with [Hamilton's defense counsel]." Then, the defendant refers this court to the fact that the prosecutor "admitted that Pinnette and Lawrence were a part of the three year old case file."

In addressing that point, we simply refer to the prosecutor's explanation to the court that he "didn't know if they would show up here or if they were back in Jamaica somewhere. That's where they usually go. And if I was on trial without any evidence at all, I would have Mr. Hamilton. I didn't know about the other two witnesses." We also note that the shooting occurred in 1996, and the state explained to the court its apparent concern over the availability of its other known witnesses after the intervening years. After noting that he was not the original prosecutor on the case, the prosecutor explained that "[l]ooking the whole file over, I figured I needed more than what I had and I went to [Hamilton's defense counsel] and offered him to take his client on one count of assault in the first degree, leaving the other counts open in return for a statement from him which would implicate the [defendant]. Because I figured the evidence I did have against [the defendant], while it was good evidence, I wasn't sure at trial time if it would be available . . . . I also knew that Mr. Hamilton was in the lockup and couldn't make bail, so he would be available to me if I needed him."

We agree with the state that "had the defendant, who had Hamilton's 'coded' letters in May of 1999, deemed Hamilton's testimony critical to his defense, he could have" sought the schedule change and avoided the added burden of asking the court for a midtrial continuance.

*Williams* also addressed the "likelihood that the denial would substantially impair the defendant's ability to defend himself." (Internal quotation marks omitted.) *State* v. *Hamilton*, supra, 228 Conn. 240. In *Williams*, the court specifically stated that after sentencing, the witness "could no longer have validly invoked his federal constitutional fifth amendment privilege against self-incrimination as to those crimes for which he was sentenced." *State* v. *Williams*, supra, 200 Conn. 321. Here, the defendant appears to assume that had his case been continued until after Hamilton's sentencing, Hamilton would then have had no valid reason to assert his fifth amendment privilege. The state correctly points out, however, that the defendant failed to make a record that Hamilton would waive his fifth amendment privilege after his sentencing pursuant to his plea agreement.

The state also argues that Hamilton may well have continued to rely on his fifth amendment privilege. The state supports that contention with several salient points. Among them are that had Hamilton confessed to having shot the victim, the state could have prosecuted him on the murder charge; see *In re Keijam T.*, 226 Conn. 497, 504–505, 628 A.2d 562 (1993); or on other charges that remained open pursuant to the plea agreement. The court appears to have considered that scenario less likely than Hamilton's simply refusing to testify because the state probably would leave the other charges open to ensure his cooperation, namely, testifying consistently with his statement. The state also argues that if Hamilton gave testimony inconsistent with the statement that he made in his plea agreement

implicating the defendant, he might have been subject to perjury charges.

Other aspects of the record reveal the court's consideration of the "likelihood that the denial [of the request for a continuance] would substantially impair the defendant's ability to defend himself . . . ." *State* v. *Hamilton*, supra, 224 Conn. 240. The defendant claims that Hamilton's testimony was crucial in that it would have introduced exculpatory testimony. Specifically, the defendant argues that Hamilton made an admission in his coded letters that he had committed the crime. The state responded that the defendant failed to make any showing that the letters contained exculpatory information. The state, through its inspector, reviewed the letters with Hamilton and stated that "[Hamilton] gave me an interpretation through [the inspector,] which throws out any inference of admissions." The record before the court provided no showing that the proposed testimony would exculpate the defendant.

In contrast, the trial court in *Williams* was aware from the commencement of the trial in that case of the intention of the defendant to rely on known exculpatory testimony. In *Williams*, the state turned over the "exculpatory" information to the defense during discovery at the defendant's request. Also, the court was aware from the start of trial of the defendant's intention to rely on that testimony. Here, although the defendant initially had asserted the "exculpatory" character of the letters with the prosecutor, he did not indicate that he intended to rely on those letters or on Hamilton's testimony until the state had rested its case. On the basis of the record before the court at the time it ruled, we conclude that the likelihood that the denial of the defendant's motion would substantially impair the defendant's ability to defend himself was slim.

We now turn to the defendant's argument that the court abused its discretion in denying his request for

a continuance because it incorrectly characterized the likely delay of the continuance as "essentially" for an indefinite duration. See footnote 7. This court and our Supreme Court have upheld denials of requests for continuances when they were sought for indefinite durations. See, e.g., *State* v. *Gordon*, 197 Conn. 413, 424A–C, 504 A.2d 1020 (1985); *State* v. *Mendez*, supra, 45 Conn. App. 285–86. Here, the court noted that it had no assurance that Hamilton would testify even if it granted the continuance because the state would likely revoke the plea agreement if Hamilton's testimony contradicted his statement. Furthermore, the court noted that if the plea agreement with Hamilton collapsed, Hamilton's trial would then begin and the defendant's continued trial would be uncertain. The court concluded that "I think under all these circumstances, I will not continue this case until such time [as] Mr. Hamilton may be sentenced, because I think that's, essentially, an indefinite continuance *based on the circumstances that [the prosecutor] explained* . . . . [S]o, we could just have an infinite period of time. Hamilton wouldn't be sentenced, and [the defendant] would never be tried. I don't think that's—and justice wouldn't be served for anybody under those circumstances."[13] (Emphasis added.) We decline to characterize the court's conclu-

---

[13] The defendant in his brief argues that the court, sua sponte, improperly addressed that scenario by suggesting a hypothetical reason to deny the request for a continuance and then, "having done so, it then denied the request." The defendant, citing *State* v. *Cox*, 50 Conn. App. 175, 182, 718 A.2d 60 (1998), aff'd, 251 Conn. 54, 738 A.2d 652 (1999), characterizes the court's conduct in that regard essentially as highly inappropriate advocacy. We note, however, that the court relied on the prosecutor's statement in casting its "hypothetical," and we decline to regard the court's prediction of the litigation, had it granted the continuance, as advocacy on the part of the court. The prosecutor explained to the court that "[his predecessors] [didn't] want to sentence [Hamilton] beforehand for fear he might turn around and say something different." In our view, the court simply acknowledged the practical realities of the case on the basis of the information it had at that time.

sion as to the likely length of the delay as improper. See *State* v. *Hamilton,* supra, 228 Conn. 240.

On the basis of our review of the factors that the court considered or of which it was aware at the time of its ruling, we cannot conclude that the court's denial of the request for a continuance was arbitrary or unreasonable under the circumstances of the case. Therefore, the court did not abuse its discretion in denying the defendant's request until the completion of Hamilton's sentencing. See id., 249.

## II

The defendant next claims that the court violated his constitutional rights when it enhanced his sentence pursuant to § 53-202k with an additional five year consecutive term without first instructing the jury on the commission of a class A, B or C felony with a firearm. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. During its charge, the court instructed the jury that it could convict the defendant as an accessory. It then charged the jury that a "dangerous instrument," for the purposes of conviction of assault in the first degree under § 53a-59 (a) (1), "is defined by statute as any instrument or thing, which, under the circumstances in which it is used, is capable of causing death or serious physical injury." The court then summarized the evidence. The court did not instruct the jury to make any findings under § 53-202k, and the state concedes as much. The defendant was convicted of assault in the first degree and conspiracy to commit assault in the first degree. At sentencing, the court, not the jury, made the requisite factual determination that the defendant had used a firearm in committing a class A, B or C felony.

The defendant concedes that he did not object to the court's imposition of the sentencing enhancement

during sentencing and requests that we review his claim under Practice Book § 60-5 or *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). His claim is appropriate for review under *Golding*.[14] See *State* v. *Davis*, 255 Conn. 782, 793 n.10, 772 A.2d 559 (2001).

We note at the outset that the record is adequate to review the claim and that it is of constitutional magnitude because it alleges the violation of a fundamental right. "An accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt. . . . [Our Supreme Court] has consistently held that a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial." (Internal quotation marks omitted.) *State* v. *Brown*, 60 Conn. App. 487, 493, 760 A.2d 111 (2000), aff'd, 259 Conn. 799, 792 A.2d 86 (2002). For the purposes of our analysis, we discern no relevant distinction between an improper instruction, as in *Brown*, and the lack of any instruction in the case at hand.

With regard to the third *Golding* factor, we again note that the state concedes that the court did not instruct the jury on § 53-202k, and we therefore must conclude that a constitutional violation clearly exists. See id. We also note that the state concentrates its

[14] In *Golding*, our Supreme Court held that a defendant can prevail on an unpreserved claim of constitutional error "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. Because we conclude that the defendant has met his burden under *Golding*, we need not afford plain error review for our resolution of his claim.

argument solely on the harmlessness inquiry. The defendant disputes the state's position as to whether harmlessness analysis is appropriate, although he addresses the issue in the alternative. Therefore, as a threshold issue, we discuss whether the violation complained of is subject to harmless error analysis. If so, we must then consider, pursuant to the fourth *Golding* factor, whether the state has proved harmlessness beyond a reasonable doubt.

Connecticut case law is clear on the question of whether harmlessness analysis is appropriate in cases such as this one. In *State* v. *Cooper*, 65 Conn. App. 551, 574, 783 A.2d 100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001), we reviewed the relevant federal as well as Connecticut case law and concluded that the United States Supreme Court's silence on the issue in *Apprendi* v. *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), notwithstanding,[15] failure by a court to have the jury determine whether the state proved that the defendant is subject to a sentence enhancement under § 53-202k can constitute harmless error.[16] See *State* v. *Montgomery*, 254 Conn. 694, 738, 759 A.2d 995 (2000).

---

[15] In *Apprendi*, the United States Supreme Court held, without discussing harmlessness, that where the statute in question has the effect of increasing the otherwise allowable statutory maximum penalty for the underlying conduct, the predicate facts must be submitted to the jury and proved beyond a reasonable doubt. *Apprendi* v. *New Jersey*, supra, 530 U.S. 490.

[16] We note that the defendant refers us to our Supreme Court's decision in *State* v. *Cator*, 256 Conn. 785, 805–806, 781 A.2d 285 (2001). Without discussing harmlessness, our Supreme Court vacated the trial court's sentence enhancement because the trial court failed to instruct the jury as to the elements of General Statutes § 53-202k. We also note, however, as does the defendant, that in the absence of discussion of the issue in *Cator*, we are bound by the earlier decisions of our Supreme Court in *State* v. *Davis*, supra, 255 Conn.782, and *State* v. *Montgomery*, 254 Conn. 694, 759 A.2d 995 (2000). See, e.g., *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 195, 676 A.2d 831 (1996) (reviewing court may not reexamine, reevaluate Supreme Court precedent).

In assessing whether the failure to instruct on the elements of § 53-202k is harmless beyond a reasonable doubt, this court is bound by the two-pronged test discussed in *State* v. *Davis*, supra, 255 Conn. 794–96. "A jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 794, citing *Neder* v. *United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

We note initially that § 53-202k applies, with limited exceptions, to "[a]ny person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any *firearm* . . . ." (Emphasis added.) General Statutes § 53-202k. The jury's finding that the defendant was guilty of having committed assault in the first degree, a class B felony, necessarily satisfied the first requirement. See *State* v. *Beall*, 61 Conn. App. 430, 435, 769 A.2d 708, cert. denied, 255 Conn. 954, 772 A.2d 152 (2001). The pertinent question, therefore, is whether the court's determination that the defendant used, displayed or represented that he possessed a firearm is harmless under *State* v. *Montgomery*, supra, 254 Conn. 694. See *State* v. *Roman*, 67 Conn. App. 194, 210–11, 786 A.2d 1147 (2001), cert. granted on other grounds, 259 Conn. 920, 791 A.2d 567 (2002).

Citing *State* v. *Velasco*, 253 Conn. 210, 231, 751 A.2d 800 (2000), the defendant argues in his principal brief that the failure to instruct was not harmless because the jury's guilty verdict was "not contingent on the defendant's use of a firearm." Although we agree that the defendant's conviction was not contingent on the

jury's finding that he used a firearm, we conclude nevertheless that the court's failure to instruct the jury was harmless beyond a reasonable doubt.[17]

The defendant argues that not only did the court fail to instruct on the elements of § 53-202k, but that the court's instructions as to the assault and conspiracy charges did not even mention the word firearm. The state argues that the evidence that the defendant or others beat the victim on the head with a pistol was overwhelming and uncontested, and that this satisfies the second element of § 53-202k, namely, that he used a firearm.

In support of its position, the state makes two relevant arguments. It first argues correctly that there was no evidence of any sort of dangerous instrument other than a pistol that was used to beat the victim. We note that firearm is a term defined by statute to include pistol.[18] The state presented five witnesses who testified that prior to the shooting, the defendant was armed with a gun. Five of those witnesses stated that they saw the defendant pistol-whip the victim. Lipscome, the only witness who did not testify about that, testified that he arrived after the shooting.

The state also argues correctly that the defendant did not refute the state's position that a pistol was used in the assault. The defendant asserted that there was no conspiracy to beat the victim and that Hamilton had acted alone. The defendant cannot, however, render the evidence that he used a firearm controverted for

[17] Although the defendant initially argued that the jury might have found that another participant, and not the defendant, had committed the crime, he now concedes that accessories as well as principal actors are subject to sentence enhancement under General Statutes § 53-202k. See *State* v. *Davis*, supra, 255 Conn. 787.

[18] General Statutes § 53a-3 (19) provides: " 'Firearm' " means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ."

the purpose of harmless error analysis by claiming simply that another participant committed the crime. Compare *State* v. *Beall*, supra, 61 Conn. App. 435–36 (evidence uncontroverted that defendant used firearm where he did not dispute evidence that victim was shot, but rather claimed he was not shooter), with *State* v. *Velasco*, supra, 253 Conn. 234 (where "defendant not only denied any involvement in the shooting, but specifically denied being in possession of a firearm" and stated that he gave it to someone else, question of whether he used firearm a contested issue).

For the reasons previously set forth, we conclude that the record establishes beyond a reasonable doubt that the omitted element, namely, that the defendant used, displayed or represented that he possessed a firearm, was uncontested and supported by overwhelming evidence. We conclude that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed properly on the elements of that section and permitted to determine whether the state had satisfied its burden of proof. In sum, the impropriety claimed by the defendant was harmless beyond a reasonable doubt. See *State* v. *Cooper*, supra, 65 Conn. App. 577. Therefore, the defendant's claim fails under the fourth prong of *Golding*.[19]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[19] We decline to review the defendant's claim under the plain error doctrine. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 279–80, 780 A.2d 53 (2001); see Practice Book § 60-5. The defendant has not met his burden.